# NOLLAN ET UX. *v.* CALIFORNIA COASTAL COMMISSION

No. 86–133.   Argued March 30, 1987—Decided June 26, 1987

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 842. BLACKMUN, J., filed a dissenting opinion, *post*, p. 865. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 866.

*Robert K. Best* argued the cause for appellants. With him on the briefs were *Ronald A. Zumbrun* and *Timothy A. Bittle.*

*Andrea Sheridan Ordin*, Chief Assistant Attorney General of California, argued the cause for appellee. With her on the brief were *John K. Van de Kamp*, Attorney General, *N. Gregory Taylor*, Assistant Attorney General, *Anthony M. Summers*, Supervising Deputy Attorney General, and *Jamee Jordan Patterson.**

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Ayer, Deputy Assistant Attorneys General Marzulla, Hookano,* and *Kmiec, Richard J. Lazarus,* and *Peter R. Steenland, Jr.;* and for the Breezy Point Cooperative by *Walter Pozen.*

Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Massachusetts et al. by *James M. Shannon*, Attorney General of Massachusetts, and *Lee P. Breckenridge* and *Nathaniel S. W. Lawrence*, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *John Steven Clark* of Arkansas, *Joseph Lieberman* of Connecticut, *Charles M. Oberly* of Delaware, *Robert Butterworth* of Florida, *Warren Price III* of Hawaii, *Neil F. Hartigan* of Illinois, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.,* of Louisiana, *James E. Tierney* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Hubert H. Humphrey III* of Minnesota, *William L. Webster* of Missouri, *Robert M. Spire* of Nebraska, *Stephen E. Merrill* of New Hampshire, *W. Cary Edwards* of New Jersey, *Robert Abrams* of New York, *Lacy H. Thornburg* of North Carolina, *Nicholas Spaeth* of North Dakota, *Dave Frohnmayer* of Oregon, *James E. O'Neil* of Rhode Island, *W. J. Michael Cody* of Tennessee, *Jim Mattox* of Texas, *Jeffrey Amestoy* of Vermont, *Kenneth O. Eikenberry* of Washington, *Charles G. Brown* of West Virginia, and *Donald J. Hanaway* of Wisconsin;

JUSTICE SCALIA delivered the opinion of the Court.

James and Marilyn Nollan appeal from a decision of the California Court of Appeal ruling that the California Coastal Commission could condition its grant of permission to rebuild their house on their transfer to the public of an easement across their beachfront property. 177 Cal. App. 3d 719, 223 Cal. Rptr. 28 (1986). The California court rejected their claim that imposition of that condition violates the Takings Clause of the Fifth Amendment, as incorporated against the States by the Fourteenth Amendment. *Ibid.* We noted probable jurisdiction. 479 U. S. 913 (1986).

## I

The Nollans own a beachfront lot in Ventura County, California. A quarter-mile north of their property is Faria County Park, an oceanside public park with a public beach and recreation area. Another public beach area, known locally as "the Cove," lies 1,800 feet south of their lot. A concrete seawall approximately eight feet high separates the beach portion of the Nollans' property from the rest of the lot. The historic mean high tide line determines the lot's oceanside boundary.

The Nollans originally leased their property with an option to buy. The building on the lot was a small bungalow, totaling 504 square feet, which for a time they rented to summer vacationers. After years of rental use, however, the building had fallen into disrepair, and could no longer be rented out.

---

for the Council of State Governments et al. by *Benna Ruth Solomon* and *Joyce Holmes Benjamin;* for Designated California Cities and Counties by *E. Clement Shute, Jr.;* and for the Natural Resources Defense Council et al. by *Fredric D. Woocher.*

Briefs of *amici curiae* were filed for the California Association of Realtors by *William M. Pfeiffer;* and for the National Association of Home Builders et al. by *Jerrold A. Fadem, Michael M. Berger,* and *Gus Bauman.*

The Nollans' option to purchase was conditioned on their promise to demolish the bungalow and replace it. In order to do so, under Cal. Pub. Res. Code Ann. §§ 30106, 30212, and 30600 (West 1986), they were required to obtain a coastal development permit from the California Coastal Commission. On February 25, 1982, they submitted a permit application to the Commission in which they proposed to demolish the existing structure and replace it with a three-bedroom house in keeping with the rest of the neighborhood.

The Nollans were informed that their application had been placed on the administrative calendar, and that the Commission staff had recommended that the permit be granted subject to the condition that they allow the public an easement to pass across a portion of their property bounded by the mean high tide line on one side, and their seawall on the other side. This would make it easier for the public to get to Faria County Park and the Cove. The Nollans protested imposition of the condition, but the Commission overruled their objections and granted the permit subject to their recordation of a deed restriction granting the easement. App. 31, 34.

On June 3, 1982, the Nollans filed a petition for writ of administrative mandamus asking the Ventura County Superior Court to invalidate the access condition. They argued that the condition could not be imposed absent evidence that their proposed development would have a direct adverse impact on public access to the beach. The court agreed, and remanded the case to the Commission for a full evidentiary hearing on that issue. *Id.*, at 36.

On remand, the Commission held a public hearing, after which it made further factual findings and reaffirmed its imposition of the condition. It found that the new house would increase blockage of the view of the ocean, thus contributing to the development of "a 'wall' of residential structures" that would prevent the public "psychologically . . . from realizing a stretch of coastline exists nearby that they have every right

to visit." *Id.*, at 58. The new house would also increase private use of the shorefront. *Id.*, at 59. These effects of construction of the house, along with other area development, would cumulatively "burden the public's ability to traverse to and along the shorefront." *Id.*, at 65–66. Therefore the Commission could properly require the Nollans to offset that burden by providing additional lateral access to the public beaches in the form of an easement across their property. The Commission also noted that it had similarly conditioned 43 out of 60 coastal development permits along the same tract of land, and that of the 17 not so conditioned, 14 had been approved when the Commission did not have administrative regulations in place allowing imposition of the condition, and the remaining 3 had not involved shorefront property. *Id.*, at 47–48.

The Nollans filed a supplemental petition for a writ of administrative mandamus with the Superior Court, in which they argued that imposition of the access condition violated the Takings Clause of the Fifth Amendment, as incorporated against the States by the Fourteenth Amendment. The Superior Court ruled in their favor on statutory grounds, finding, in part to avoid "issues of constitutionality," that the California Coastal Act of 1976, Cal. Pub. Res. Code Ann. § 30000 *et seq.* (West 1986), authorized the Commission to impose public access conditions on coastal development permits for the replacement of an existing single-family home with a new one only where the proposed development would have an adverse impact on public access to the sea. App. 419. In the court's view, the administrative record did not provide an adequate factual basis for concluding that replacement of the bungalow with the house would create a direct or cumulative burden on public access to the sea. *Id.*, at 416–417. Accordingly, the Superior Court granted the writ of mandamus and directed that the permit condition be struck.

The Commission appealed to the California Court of Appeal. While that appeal was pending, the Nollans satisfied

the condition on their option to purchase by tearing down the bungalow and building the new house, and bought the property. They did not notify the Commission that they were taking that action.

The Court of Appeal reversed the Superior Court. 177 Cal. App. 3d 719, 223 Cal. Rptr. 28 (1986). It disagreed with the Superior Court's interpretation of the Coastal Act, finding that it required that a coastal permit for the construction of a new house whose floor area, height or bulk was more than 10% larger than that of the house it was replacing be conditioned on a grant of access. *Id.*, at 723–724, 223 Cal. Rptr., at 31; see Cal. Pub. Res. Code Ann. § 30212. It also ruled that that requirement did not violate the Constitution under the reasoning of an earlier case of the Court of Appeal, *Grupe* v. *California Coastal Comm'n,* 166 Cal. App. 3d 148, 212 Cal. Rptr. 578 (1985). In that case, the court had found that so long as a project contributed to the need for public access, even if the project standing alone had not created the need for access, and even if there was only an indirect relationship between the access exacted and the need to which the project contributed, imposition of an access condition on a development permit was sufficiently related to burdens created by the project to be constitutional. 177 Cal. App. 3d, at 723, 223 Cal. Rptr., at 30–31; see *Grupe, supra,* at 165–168, 212 Cal. Rptr., at 587–590; see also *Remmenga* v. *California Coastal Comm'n,* 163 Cal. App. 3d 623, 628, 209 Cal. Rptr. 628, 631, appeal dism'd, 474 U. S. 915 (1985). The Court of Appeal ruled that the record established that that was the situation with respect to the Nollans' house. 177 Cal. App. 3d, at 722–723, 223 Cal. Rptr., at 30–31. It ruled that the Nollans' taking claim also failed because, although the condition diminished the value of the Nollans' lot, it did not deprive them of all reasonable use of their property. *Id.,* at 723, 223 Cal. Rptr., at 30; see *Grupe, supra,* at 175–176, 212 Cal. Rptr., at 595–596. Since, in the Court of Appeal's view, there was no statutory or constitutional obstacle to imposi-

tion of the access condition, the Superior Court erred in granting the writ of mandamus. The Nollans appealed to this Court, raising only the constitutional question.

## II

Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking. To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather (as JUSTICE BRENNAN contends) "a mere restriction on its use," *post*, at 848–849, n. 3, is to use words in a manner that deprives them of all their ordinary meaning. Indeed, one of the principal uses of the eminent domain power is to assure that the government be able to require conveyance of just such interests, so long as it pays for them. J. Sackman, 1 Nichols on Eminent Domain § 2.1[1] (Rev. 3d ed. 1985), 2 *id.*, § 5.01[5]; see 1 *id.*, § 1.42[9], 2 *id.*, § 6.14. Perhaps because the point is so obvious, we have never been confronted with a controversy that required us to rule upon it, but our cases' analysis of the effect of other governmental action leads to the same conclusion. We have repeatedly held that, as to property reserved by its owner for private use, "the right to exclude [others is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 433 (1982), quoting *Kaiser Aetna* v. *United States*, 444 U. S. 164, 176 (1979). In *Loretto* we observed that where governmental action results in "[a] permanent physical occupation" of the property, by the government itself or by others, see 458 U. S., at 432–433, n. 9, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public

benefit or has only minimal economic impact on the owner," *id.*, at 434–435. We think a "permanent physical occupation" has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.[1]

JUSTICE BRENNAN argues that while this might ordinarily be the case, the California Constitution's prohibition on any individual's "exclu[ding] the right of way to [any navigable] water whenever it is required for any public purpose," Art. X, § 4, produces a different result here. *Post*, at 847–848, see also *post*, at 855, 857. There are a number of difficulties with that argument. Most obviously, the right of way sought here is not naturally described as one *to* navigable water (from the street to the sea) but *along* it; it is at least highly questionable whether the text of the California Constitution has any prima facie application to the situation before us. Even if it does, however, several California cases suggest that JUSTICE BRENNAN's interpretation of the effect of the clause is erroneous, and that to obtain easements of access across private property the State must proceed through its eminent domain power. See *Bolsa Land Co.* v. *Burdick*, 151 Cal. 254, 260, 90 P. 532, 534–535 (1907); *Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160, 185, 50 P. 277, 286 (1897); *Heist* v. *County of Colusa*, 163 Cal. App. 3d 841, 851, 213 Cal. Rptr. 278, 285 (1984); *Aptos Seascape Corp.* v. *Santa Cruz*, 138 Cal. App. 3d 484, 505–506, 188 Cal. Rptr. 191, 204–205 (1982). (None of these cases specifically ad-

---

[1] The holding of *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), is not inconsistent with this analysis, since there the owner had already opened his property to the general public, and in addition permanent access was not required. The analysis of *Kaiser Aetna* v. *United States*, 444 U. S. 164 (1979), is not inconsistent because it was affected by traditional doctrines regarding navigational servitudes. Of course neither of those cases involved, as this one does, a classic right-of-way easement.

dressed the argument that Art. X, § 4, allowed the public to cross private property to get to navigable water, but if that provision meant what JUSTICE BRENNAN believes, it is hard to see why it was not invoked.)  See also 41 Op. Cal. Atty. Gen. 39, 41 (1963) ("In spite of the sweeping provisions of [Art. X, § 4], and the injunction therein to the Legislature to give its provisions the most liberal interpretation, the few reported cases in California have adopted the general rule that one may not trespass on private land to get to navigable tidewaters for the purpose of commerce, navigation or fishing"). In light of these uncertainties, and given the fact that, as JUSTICE BLACKMUN notes, the Court of Appeal did not rest its decision on Art. X, § 4, *post*, at 865, we should assuredly not take it upon ourselves to resolve this question of California constitutional law in the first instance.  See, *e. g.*, *Jenkins* v. *Anderson*, 447 U. S. 231, 234, n. 1 (1980).  That would be doubly inappropriate since the Commission did not advance this argument in the Court of Appeal, and the Nollans argued in the Superior Court that any claim that there was a pre-existing public right of access had to be asserted through a quiet title action, see Points and Authorities in Support of Motion for Writ of Administrative Mandamus, No. SP50805 (Super. Ct. Cal.), p. 20, which the Commission, possessing no claim to the easement itself, probably would not have had standing under California law to bring.  See Cal. Code Civ. Proc. Ann. § 738 (West 1980).[2]

---

[2]JUSTICE BRENNAN also suggests that the Commission's public announcement of its intention to condition the rebuilding of houses on the transfer of easements of access caused the Nollans to have "no reasonable claim to any expectation of being able to exclude members of the public" from walking across their beach.  *Post*, at 857–860.  He cites our opinion in *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986 (1984), as support for the peculiar proposition that a unilateral claim of entitlement by the government can alter property rights.  In *Monsanto*, however, we found merely that the Takings Clause was not violated by giving effect to the Government's announcement that application for "*the right to [the] valuable Government benefit,*" *id.*, at 1007 (emphasis added), of obtaining registration

Given, then, that requiring uncompensated conveyance of the easement outright would violate the Fourteenth Amendment, the question becomes whether requiring it to be conveyed as a condition for issuing a land-use permit alters the outcome. We have long recognized that land-use regulation does not effect a taking if it "substantially advance[s] legitimate state interests" and does not "den[y] an owner economically viable use of his land," *Agins* v. *Tiburon*, 447 U. S. 255, 260 (1980). See also *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 127 (1978) ("[A] use restriction may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial government purpose"). Our cases have not elaborated on the standards for determining what constitutes a "legitimate state interest" or what type of connection between the regulation and the state interest satisfies the requirement that the former "substantially advance" the latter.[3] They have made clear, however, that a

of an insecticide would confer upon the Government a license to use and disclose the trade secrets contained in the application. *Id.*, at 1007–1008. See also *Bowen* v. *Gilliard, ante,* at 605. But the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a "governmental benefit." And thus the announcement that the application for (or granting of) the permit will entail the yielding of a property interest cannot be regarded as establishing the voluntary "exchange," 467 U. S., at 1007, that we found to have occurred in *Monsanto.* Nor are the Nollans' rights altered because they acquired the land well after the Commission had begun to implement its policy. So long as the Commission could not have deprived the prior owners of the easement without compensating them, the prior owners must be understood to have transferred their full property rights in conveying the lot.

[3] Contrary to JUSTICE BRENNAN's claim, *post,* at 843, our opinions do not establish that these standards are the same as those applied to due process or equal protection claims. To the contrary, our verbal formulations in the takings field have generally been quite different. We have required that the regulation "substantially advance" the "legitimate state interest" sought to be achieved, *Agins* v. *Tiburon*, 447 U. S. 255, 260 (1980), not that "the State '*could rationally have decided*' that the measure adopted might achieve the State's objective." *Post,* at 843, quoting *Minnesota* v.

broad range of governmental purposes and regulations satis-
fies these requirements. See *Agins* v. *Tiburon, supra,* at
260–262 (scenic zoning); *Penn Central Transportation Co.* v.
*New York City, supra* (landmark preservation); *Euclid* v.
*Ambler Realty Co.,* 272 U. S. 365 (1926) (residential zoning);
Laitos & Westfall, Government Interference with Private In-
terests in Public Resources, 11 Harv. Envtl. L. Rev. 1, 66
(1987). The Commission argues that among these permissi-
ble purposes are protecting the public's ability to see the
beach, assisting the public in overcoming the "psychological
barrier" to using the beach created by a developed shore-
front, and preventing congestion on the public beaches. We
assume, without deciding, that this is so—in which case
the Commission unquestionably would be able to deny the
Nollans their permit outright if their new house (alone, or by
reason of the cumulative impact produced in conjunction with
other construction)[4] would substantially impede these pur-

*Clover Leaf Creamery Co.,* 449 U. S. 456, 466 (1981). JUSTICE BRENNAN
relies principally on an equal protection case, *Minnesota* v. *Clover Leaf
Creamery Co., supra,* and two substantive due process cases, *Williamson*
v. *Lee Optical of Oklahoma, Inc.,* 348 U. S. 483, 487–488 (1955), and *Day-
Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, 423 (1952), in support of
the standards he would adopt. But there is no reason to believe (and the
language of our cases gives some reason to disbelieve) that so long as the
regulation of property is at issue the standards for takings challenges, due
process challenges, and equal protection challenges are identical; any more
than there is any reason to believe that so long as the regulation of speech
is at issue the standards for due process challenges, equal protection chal-
lenges, and First Amendment challenges are identical. *Goldblatt* v.
*Hempstead,* 369 U. S. 590 (1962), does appear to assume that the inquiries
are the same, but that assumption is inconsistent with the formulations of
our later cases.

[4] If the Nollans were being singled out to bear the burden of California's
attempt to remedy these problems, although they had not contributed to it
more than other coastal landowners, the State's action, even if otherwise
valid, might violate either the incorporated Takings Clause or the Equal
Protection Clause. One of the principal purposes of the Takings Clause is
"to bar Government from forcing some people alone to bear public burdens

poses, unless the denial would interfere so drastically with the Nollans' use of their property as to constitute a taking. See *Penn Central Transportation Co.* v. *New York City*, *supra*.

The Commission argues that a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking. We agree. Thus, if the Commission attached to the permit some condition that would have protected the public's ability to see the beach notwithstanding construction of the new house—for example, a height limitation, a width restriction, or a ban on fences—so long as the Commission could have exercised its police power (as we have assumed it could) to forbid construction of the house altogether, imposition of the condition would also be constitutional. Moreover (and here we come closer to the facts of the present case), the condition would be constitutional even if it consisted of the requirement that the Nollans provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere. Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end. If a prohibition designed to accomplish that purpose would be a legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the

which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960); see also *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621, 656 (1981) (BRENNAN, J., dissenting); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 123 (1978). But that is not the basis of the Nollans' challenge here.

owner an alternative to that prohibition which accomplishes the same purpose is not.

The evident constitutional propriety disappears, however, if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition. When that essential nexus is eliminated, the situation becomes the same as if California law forbade shouting fire in a crowded theater, but granted dispensations to those willing to contribute $100 to the state treasury. While a ban on shouting fire can be a core exercise of the State's police power to protect the public safety, and can thus meet even our stringent standards for regulation of speech, adding the unrelated condition alters the purpose to one which, while it may be legitimate, is inadequate to sustain the ban. Therefore, even though, in a sense, requiring a $100 tax contribution in order to shout fire is a lesser restriction on speech than an outright ban, it would not pass constitutional muster. Similarly here, the lack of nexus between the condition and the original purpose of the building restriction converts that purpose to something other than what it was. The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation. Whatever may be the outer limits of "legitimate state interests" in the takings and land-use context, this is not one of them. In short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but "an out-and-out plan of extortion." *J. E. D. Associates, Inc.* v. *Atkinson,* 121 N. H. 581, 584, 432 A. 2d 12, 14–15 (1981); see Brief for United States as *Amicus Curiae* 22, and n. 20. See also *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S., at 439, n. 17.[5]

---

[5] One would expect that a regime in which this kind of leveraging of the police power is allowed would produce stringent land-use regulation which the State then waives to accomplish other purposes, leading to lesser realization of the land-use goals purportedly sought to be served than would

## III

The Commission claims that it concedes as much, and that we may sustain the condition at issue here by finding that it is reasonably related to the public need or burden that the Nollans' new house creates or to which it contributes.   We can accept, for purposes of discussion, the Commission's proposed test as to how close a "fit" between the condition and the burden is required, because we find that this case does not meet even the most untailored standards.   The Commission's principal contention to the contrary essentially turns on a play on the word "access."   The Nollans' new house, the Commission found, will interfere with "visual access" to the beach.   That in turn (along with other shorefront development) will interfere with the desire of people who drive past the Nollans' house to use the beach, thus creating a "psychological barrier" to "access."   The Nollans' new house will also, by a process not altogether clear from the Commission's opinion but presumably potent enough to more than offset the effects of the psychological barrier, increase the use of the public beaches, thus creating the need for more "access." These burdens on "access" would be alleviated by a requirement that the Nollans provide "lateral access" to the beach.

Rewriting the argument to eliminate the play on words makes clear that there is nothing to it.   It is quite impossible to understand how a requirement that people already on the public beaches be able to walk across the Nollans' property reduces any obstacles to viewing the beach created by the new house.   It is also impossible to understand how it lowers any "psychological barrier" to using the public beaches, or how it helps to remedy any additional congestion on them

---

result from more lenient (but nontradeable) development restrictions. Thus, the importance of the purpose underlying the prohibition not only does not *justify* the imposition of unrelated conditions for eliminating the prohibition, but positively militates against the practice.

caused by construction of the Nollans' new house. We therefore find that the Commission's imposition of the permit condition cannot be treated as an exercise of its land-use power for any of these purposes.[6] Our conclusion on this point is consistent with the approach taken by every other court that has considered the question, with the exception of the California state courts. See *Parks* v. *Watson*, 716 F. 2d 646, 651–653 (CA9 1983); *Bethlehem Evangelical Lutheran Church* v. *Lakewood*, 626 P. 2d 668, 671–674 (Colo. 1981); *Aunt Hack Ridge Estates, Inc.* v. *Planning Comm'n*, 160 Conn. 109, 117–120, 273 A. 2d 880, 885 (1970); *Longboat Key* v. *Lands End, Ltd.*, 433 So. 2d 574 (Fla. App. 1983); *Pioneer Trust & Savings Bank* v. *Mount Prospect*, 22 Ill. 2d 375, 380, 176 N. E. 2d 799, 802 (1961); *Lampton* v. *Pinaire*, 610 S. W. 2d 915, 918–919 (Ky. App. 1980); *Schwing* v. *Baton Rouge*, 249 So. 2d 304 (La. App.), application denied, 259 La. 770, 252 So. 2d 667 (1971); *Howard County* v. *JJM, Inc.*, 301 Md. 256, 280–282, 482 A. 2d 908, 920–921 (1984); *Collis* v. *Bloomington*, 310 Minn. 5, 246 N. W. 2d 19 (1976); *State ex rel. Noland* v. *St. Louis County*, 478 S. W. 2d 363 (Mo. 1972);

---

[6] As JUSTICE BRENNAN notes, the Commission also argued that the construction of the new house would " 'increase private use immediately adjacent to public tidelands,' " which in turn might result in more disputes between the Nollans and the public as to the location of the boundary. *Post*, 851, quoting App. 62. That risk of boundary disputes, however, is inherent in the right to exclude others from one's property, and the construction here can no more justify mandatory dedication of a sort of "buffer zone" in order to avoid boundary disputes than can the construction of an addition to a single-family house near a public street. Moreover, a buffer zone has a boundary as well, and unless that zone is a "no-man's land" that is off limits for both neighbors (which is of course not the case here) its creation achieves nothing except to shift the location of the boundary dispute further on to the private owner's land. It is true that in the distinctive situation of the Nollans' property the seawall could be established as a clear demarcation of the public easement. But since not all of the lands to which this land-use condition applies have such a convenient reference point, the avoidance of boundary disputes is, even more obviously than the others, a made-up purpose of the regulation.

*Billings Properties, Inc.* v. *Yellowstone County,* 144 Mont. 25, 33–36, 394 P. 2d 182, 187–188 (1964); *Simpson* v. *North Platte,* 206 Neb. 240, 292 N. W. 2d 297 (1980); *Briar West, Inc.* v. *Lincoln,* 206 Neb. 172, 291 N. W. 2d 730 (1980); *J. E. D. Associates* v. *Atkinson,* 121 N. H. 581, 432 A. 2d 12 (1981); *Longridge Builders, Inc.* v. *Planning Bd. of Princeton,* 52 N. J. 348, 350–351, 245 A. 2d 336, 337–338 (1968); *Jenad, Inc.* v. *Scarsdale,* 18 N. Y. 2d 78, 218 N. E. 2d 673 (1966); *MacKall* v. *White,* 85 App. Div. 2d 696, 445 N. Y. S. 2d 486 (1981), appeal denied, 56 N. Y. 2d 503, 435 N. E. 2d 1100 (1982); *Frank Ansuini, Inc.* v. *Cranston,* 107 R. I. 63, 68–69, 71, 264 A. 2d 910, 913, 914 (1970); *College Station* v. *Turtle Rock Corp.,* 680 S. W. 2d 802, 807 (Tex. 1984); *Call* v. *West Jordan,* 614 P. 2d 1257, 1258–1259 (Utah 1980); *Board of Supervisors of James City County* v. *Rowe,* 216 Va. 128, 136–139, 216 S. E. 2d 199, 207–209 (1975); *Jordan* v. *Menomonee Falls,* 28 Wis. 2d 608, 617–618, 137 N. W. 2d 442, 447–449 (1965), appeal dism'd, 385 U. S. 4 (1966). See also *Littlefield* v. *Afton,* 785 F. 2d 596, 607 (CA8 1986); Brief for National Association of Home Builders et al. as *Amici Curiae* 9–16.

JUSTICE BRENNAN argues that imposition of the access requirement is not irrational. In his version of the Commission's argument, the reason for the requirement is that in its absence, a person looking toward the beach from the road will see a street of residential structures including the Nollans' new home and conclude that there is no public beach nearby. If, however, that person sees people passing and repassing along the dry sand behind the Nollans' home, he will realize that there is a public beach somewhere in the vicinity. *Post,* at 849–850. The Commission's action, however, was based on the opposite factual finding that the wall of houses completely blocked the view of the beach and that a person looking from the road would not be able to see it at all. App. 57–59.

Even if the Commission had made the finding that JUSTICE BRENNAN proposes, however, it is not certain that it would

suffice. We do not share JUSTICE BRENNAN's confidence that the Commission "should have little difficulty in the future in utilizing its expertise to demonstrate a specific connection between provisions for access and burdens on access," *post*, at 862, that will avoid the effect of today's decision. We view the Fifth Amendment's Property Clause to be more than a pleading requirement, and compliance with it to be more than an exercise in cleverness and imagination. As indicated earlier, our cases describe the condition for abridgment of property rights through the police power as a "*substantial* advanc[ing]" of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective.

We are left, then, with the Commission's justification for the access requirement unrelated to land-use regulation:

> "Finally, the Commission notes that there are several existing provisions of pass and repass lateral access benefits already given by past Faria Beach Tract applicants as a result of prior coastal permit decisions. The access required as a condition of this permit is part of a comprehensive program to provide continuous public access along Faria Beach as the lots undergo development or redevelopment." App. 68.

That is simply an expression of the Commission's belief that the public interest will be served by a continuous strip of publicly accessible beach along the coast. The Commission may well be right that it is a good idea, but that does not establish that the Nollans (and other coastal residents) alone can be compelled to contribute to its realization. Rather, California is free to advance its "comprehensive program," if it wishes, by using its power of eminent domain for this "public pur-

pose," see U. S. Const., Amdt. 5; but if it wants an easement across the Nollans' property, it must pay for it.

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Appellants in this case sought to construct a new dwelling on their beach lot that would both diminish visual access to the beach and move private development closer to the public tidelands. The Commission reasonably concluded that such "buildout," both individually and cumulatively, threatens public access to the shore. It sought to offset this encroachment by obtaining assurance that the public may walk along the shoreline in order to gain access to the ocean. The Court finds this an illegitimate exercise of the police power, because it maintains that there is no reasonable relationship between the effect of the development and the condition imposed.

The first problem with this conclusion is that the Court imposes a standard of precision for the exercise of a State's police power that has been discredited for the better part of this century. Furthermore, even under the Court's cramped standard, the permit condition imposed in this case directly responds to the specific type of burden on access created by appellants' development. Finally, a review of those factors deemed most significant in takings analysis makes clear that the Commission's action implicates none of the concerns underlying the Takings Clause. The Court has thus struck down the Commission's reasonable effort to respond to intensified development along the California coast, on behalf of landowners who can make no claim that their reasonable expectations have been disrupted. The Court has, in short, given appellants a windfall at the expense of the public.

## I

The Court's conclusion that the permit condition imposed on appellants is unreasonable cannot withstand analysis. First, the Court demands a degree of exactitude that is in-

consistent with our standard for reviewing the rationality of a State's exercise of its police power for the welfare of its citizens. Second, even if the nature of the public-access condition imposed must be identical to the precise burden on access created by appellants, this requirement is plainly satisfied.

A

There can be no dispute that the police power of the States encompasses the authority to impose conditions on private development. See, *e. g., Agins* v. *Tiburon,* 447 U. S. 255 (1980); *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104 (1978); *Gorieb* v. *Fox,* 274 U. S. 603 (1927). It is also by now commonplace that this Court's review of the rationality of a State's exercise of its police power demands only that the State *"could rationally have decided"* that the measure adopted might achieve the State's objective. *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 466 (1981) (emphasis in original).[1] In this case, California has

---

[1] See also *Williamson* v. *Lee Optical of Oklahoma, Inc.,* 348 U. S. 483, 487–488 (1955) ("[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it"); *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421, 423 (1952) ("Our recent decisions make it plain that we do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare. . . . [S]tate legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare").

Notwithstanding the suggestion otherwise, *ante,* at 834–835, n. 3, our standard for reviewing the threshold question whether an exercise of the police power is legitimate is a uniform one. As we stated over 25 years ago in addressing a takings challenge to government regulation:

"The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests. Except for the substitution of the familiar standard of 'reasonableness,' this Court has generally refrained from announcing any specific criteria. The classic statement of the rule in *Lawton* v. *Steele,* 152 U. S. 133, 137 (1894), is still valid today: . . . '[I]t must appear, first, that the interests of the public . . . require [govern-

employed its police power in order to condition development upon preservation of public access to the ocean and tidelands. The Coastal Commission, if it had so chosen, could have de-

ment] interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' Even this rule is not applied with strict precision, for this Court has often said that 'debatable questions as to reasonableness are not for the courts but for the legislature . . . .' *E. g., Sproles* v. *Binford,* 286 U. S. 374, 388 (1932)." *Goldblatt* v. *Hempstead,* 369 U. S. 590, 594–595 (1962).

See also *id.,* at 596 (upholding regulation from takings challenge with citation to, *inter alia, United States* v. *Carolene Products Co.,* 304 U. S. 144, 154 (1938), for proposition that exercise of police power will be upheld if "any state of facts either known or which could be reasonably assumed affords support for it"). In *Connolly* v. *Pension Benefit Guaranty Corporation,* 475 U. S. 211 (1986), for instance, we reviewed a takings challenge to statutory provisions that had been held to be a legitimate exercise of the police power under due process analysis in *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717 (1984). *Gray,* in turn, had relied on *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1 (1976). In rejecting the takings argument that the provisions were not within Congress' regulatory power, the Court in *Connolly* stated: "Although both *Gray* and *Turner Elkhorn* were due process cases, it would be surprising indeed to discover now that in both cases Congress unconstitutionally had taken the assets of the employers there involved." 475 U. S., at 223. Our phraseology may differ slightly from case to case—*e. g.,* regulation must "substantially advance," *Agins* v. *Tiburon,* 447 U. S. 255, 260 (1980), or be "reasonably necessary to," *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 127 (1978), the government's end. These minor differences cannot, however, obscure the fact that the inquiry in each case is the same.

Of course, government action may be a valid exercise of the police power and still violate specific provisions of the Constitution. JUSTICE SCALIA is certainly correct in observing that challenges founded upon these provisions are reviewed under different standards. *Ante,* at 834–835, n. 3. Our consideration of factors such as those identified in *Penn Central, supra,* for instance, provides an analytical framework for protecting the values underlying the Takings Clause, and other distinctive approaches are utilized to give effect to other constitutional provisions. This is far different, however, from the use of different standards of review to address the threshold issue of the rationality of government action.

nied the Nollans' request for a development permit, since the property would have remained economically viable without the requested new development.[2]  Instead, the State sought to accommodate the Nollans' desire for new development, on the condition that the development not diminish the overall amount of public access to the coastline.  Appellants' proposed development would reduce public access by restricting visual access to the beach, by contributing to an increased need for community facilities, and by moving private development closer to public beach property.  The Commission sought to offset this diminution in access, and thereby preserve the overall balance of access, by requesting a deed restriction that would ensure "lateral" access: the right of the public to pass and repass along the dry sand parallel to the shoreline in order to reach the tidelands and the ocean.  In the expert opinion of the Coastal Commission, development conditioned on such a restriction would fairly attend to both public and private interests.

The Court finds fault with this measure because it regards the condition as insufficiently tailored to address the precise

---

[2] As this Court declared in *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 127 (1985):

"A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner.  Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred."

We also stated in *Kaiser Aetna* v. *United States*, 444 U. S. 164, 179 (1979), with respect to dredging to create a private marina:

"We have not the slightest doubt that the Government could have refused to allow such dredging on the ground that it would have impaired navigation in the bay, or could have conditioned its approval of the dredging on petitioners' agreement to comply with various measures that it deemed appropriate for the promotion of navigation."

type of reduction in access produced by the new development. The Nollans' development blocks visual access, the Court tells us, while the Commission seeks to preserve lateral access along the coastline. Thus, it concludes, the State acted irrationally. Such a narrow conception of rationality, however, has long since been discredited as a judicial arrogation of legislative authority. "To make scientific precision a criterion of constitutional power would be to subject the State to an intolerable supervision hostile to the basic principles of our Government." *Sproles* v. *Binford*, 286 U. S. 374, 388 (1932). Cf. *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 491, n. 21 (1987) ("The Takings Clause has never been read to require the States or the courts to calculate whether a specific individual has suffered burdens . . . in excess of the benefits received"). As this Court long ago declared with regard to various forms of restriction on the use of property:

> "Each interferes in the same way, if not to the same extent, with the owner's general right of dominion over his property. All rest for their justification upon the same reasons which have arisen in recent times as a result of the great increase and concentration of population in urban communities and the vast changes in the extent and complexity of the problems of modern city life. State legislatures and city councils, who deal with the situation from a practical standpoint, are better qualified than the courts to determine the necessity, character, and degree of regulation which these new and perplexing conditions require; and their conclusions should not be disturbed by the courts unless clearly arbitrary and unreasonable." *Gorieb*, 274 U. S., at 608 (citations omitted).

The Commission is charged by both the State Constitution and legislature to preserve overall public access to the California coastline. Furthermore, by virtue of its participation in the Coastal Zone Management Act (CZMA) program, the

State must "exercise effectively [its] responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone," 16 U. S. C. § 1452(2), so as to provide for, *inter alia,* "public access to the coas[t] for recreation purposes." § 1452(2)(D). The Commission has sought to discharge its responsibilities in a flexible manner. It has sought to balance private and public interests and to accept tradeoffs: to permit development that reduces access in some ways as long as other means of access are enhanced. In this case, it has determined that the Nollans' burden on access would be offset by a deed restriction that formalizes the public's right to pass along the shore. In its informed judgment, such a tradeoff would preserve the net amount of public access to the coastline. The Court's insistence on a precise fit between the forms of burden and condition on each individual parcel along the California coast would penalize the Commission for its flexibility, hampering the ability to fulfill its public trust mandate.

The Court's demand for this precise fit is based on the assumption that private landowners in this case possess a reasonable expectation regarding the use of their land that the public has attempted to disrupt. In fact, the situation is precisely the reverse: it is private landowners who are the interlopers. The public's expectation of access considerably antedates any private development on the coast. Article X, § 4, of the California Constitution, adopted in 1879, declares:

> "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so

that access to the navigable waters of this State shall always be attainable for the people thereof."

It is therefore private landowners who threaten the disruption of settled public expectations. Where a private landowner has had a reasonable expectation that his or her property will be used for exclusively private purposes, the disruption of this expectation dictates that the government pay if it wishes the property to be used for a public purpose. In this case, however, the State has sought to protect *public* expectations of access from disruption by private land use. The State's exercise of its police power for this purpose deserves no less deference than any other measure designed to further the welfare of state citizens.

Congress expressly stated in passing the CZMA that "[i]n light of competing demands and the urgent need to protect and to give high priority to natural systems in the coastal zone, present state and local institutional arrangements for planning and regulating land and water uses in such areas are inadequate." 16 U. S. C. § 1451(h). It is thus puzzling that the Court characterizes as a "non-land-use justification," *ante,* at 841, the exercise of the police power to "'provide continuous public access along Faria Beach as the lots undergo development or redevelopment.'" *Ibid.* (quoting App. 68). The Commission's determination that certain types of development jeopardize public access to the ocean, and that such development should be conditioned on preservation of access, is the essence of responsible land-use planning. The Court's use of an unreasonably demanding standard for determining the rationality of state regulation in this area thus could hamper innovative efforts to preserve an increasingly fragile national resource.[3]

___

[3] The list of cases cited by the Court as support for its approach, *ante,* at 839–840, includes no instance in which the State sought to vindicate preexisting rights of access to navigable water, and consists principally of cases involving a requirement of the dedication of land as a condition of subdivision approval. Dedication, of course, requires the surrender of

## B

Even if we accept the Court's unusual demand for a precise match between the condition imposed and the specific type of burden on access created by the appellants, the State's action easily satisfies this requirement. First, the lateral access condition serves to dissipate the impression that the beach that lies behind the wall of homes along the shore is for private use only.. It requires no exceptional imaginative powers to find plausible the Commission's point that the average person passing along the road in front of a phalanx of imposing permanent residences, including the appellants' new home, is likely to conclude that this particular portion of the shore is not open to the public. If, however, that person can see that numerous people are passing and repassing along the dry sand, this conveys the message that the beach is in fact open for use by the public. Furthermore, those persons who go down to the public beach a quarter-mile away will be able to look down the coastline and see that persons have continuous access to the tidelands, and will observe signs that proclaim the public's right of access over the dry sand. The burden produced by the diminution in visual access—the impression that the beach is not open to the public—is thus directly alleviated by the provision for public access over the dry sand. The Court therefore has an

_____

ownership of property rather than, as in this case, a mere restriction on its use. The only case pertaining to beach access among those cited by the Court is *MacKall* v. *White*, 85 App. Div. 2d 696, 445 N. Y. S. 2d 486 (1981). In that case, the court found that a subdivision application could not be conditioned upon a declaration that the landowner would not hinder the public from using a trail that had been used to gain access to a bay. The trail had been used despite posted warnings prohibiting passage, and despite the owner's resistance to such use. In that case, unlike this one, neither the State Constitution, state statute, administrative practice, nor the conduct of the landowner operated to create any reasonable expectation of a right of public access.

unrealistically limited conception of what measures could reasonably be chosen to mitigate the burden produced by a diminution of visual access.

The second flaw in the Court's analysis of the fit between burden and exaction is more fundamental. The Court assumes that the only burden with which the Coastal Commission was concerned was blockage of visual access to the beach. This is incorrect.[4] The Commission specifically stated in its report in support of the permit condition that "[t]he Commission finds that the applicants' proposed development would present an increase in view blockage, *an increase in private use of the shorefront*, and that this impact would burden the public's ability to traverse to and along the shorefront." App. 65–66 (emphasis added). It declared that the possibility that "the public may get the impression that the beachfront is no longer available for public use" would be "due to *the encroaching nature of private use immediately adjacent to the public use, as well as* the visual 'block' of increased residential build-out impacting the visual quality of the beachfront." *Id.*, at 59 (emphasis added).

The record prepared by the Commission is replete with references to the threat to public access along the coastline resulting from the seaward encroachment of private development along a beach whose mean high-tide line is constantly shifting. As the Commission observed in its report: "The Faria Beach shoreline fluctuates during the year depending on the seasons and accompanying storms, and the public is not always able to traverse the shoreline below the mean

---

[4] This may be because the State in its briefs and at argument contended merely that the permit condition would serve to preserve overall public access, by offsetting the diminution in access resulting from the project, such as, *inter alia*, blocking the public's view of the beach. The State's position no doubt reflected the reasonable assumption that the Court would evaluate the rationality of its exercise of the police power in accordance with the traditional standard of review, and that the Court would not attempt to substitute its judgment about the best way to preserve overall public access to the ocean at the Faria Family Beach Tract.

high tide line." *Id.*, at 67. As a result, the boundary be-
tween publicly owned tidelands and privately owned beach is
not a stable one, and "[t]he existing seawall is located very
near to the mean high water line." *Id.*, at 61. When the
beach is at its largest, the seawall is about 10 feet from the
mean high-tide mark; "[d]uring the period of the year when
the beach suffers erosion, the mean high water line appears
to be located either on or beyond the existing seawall."
*Ibid.* Expansion of private development on appellants' lot
toward the seawall would thus "increase private use immedi-
ately adjacent to public tidelands, which has the potential of
causing adverse impacts on the public's ability to traverse the
shoreline." *Id.*, at 62. As the Commission explained:

> "The placement of more private use adjacent to public
> tidelands has the potential of creating use conflicts be-
> tween the applicants and the public. The results of new
> private use encroachment into boundary/buffer areas be-
> tween private and public property can create situations
> in which landowners intimidate the public and seek to
> prevent them from using public tidelands because of dis-
> putes between the two parties over where the exact
> boundary between private and public ownership is lo-
> cated. If the applicants' project would result in further
> seaward encroachment of private use into an area of
> clouded title, new private use in the subject encroach-
> ment area could result in use conflict between private
> and public entities on the subject shorefront." *Id.*, at
> 61–62.

The deed restriction on which permit approval was con-
ditioned would directly address this threat to the public's
access to the tidelands. It would provide a formal declara-
tion of the public's right of access, thereby ensuring that the
shifting character of the tidelands, and the presence of pri-
vate development immediately adjacent to it, would not jeop-

ardize enjoyment of that right.[5]   The imposition of the per-
mit condition was therefore directly related to the fact that
appellants' development would be "located along a unique
stretch of coast where lateral public access is inadequate due
to the construction of private residential structures and
shoreline protective devices along a fluctuating shoreline."
*Id.*, at 68.   The deed restriction was crafted to deal with
the particular character of the beach along which appellants
sought to build, and with the specific problems created by
expansion of development toward the public tidelands.   In
imposing the restriction, the State sought to ensure that such
development would not disrupt the historical expectation of
the public regarding access to the sea.[6]

---

[5] As the Commission's *Public Access (Shoreline) Interpretative Guide-
lines* state:

"[T]he provision of lateral access recognizes the potential for conflicts be-
tween public and private use and creates a type of access that allows the
public to move freely along all the tidelands in an area that can be clearly
delineated and distinguished from private use areas. . . . Thus the 'need'
determination set forth in P[ublic] R[esources] C[ode] 30212(a)(2) should be
measured in terms of providing access that buffers public access to the
tidelands from the burdens generated on access by private development."
App. 358–359.

[6] The Court suggests that the risk of boundary disputes "is inherent in
the right to exclude others from one's property," and thus cannot serve as
a purpose to support the permit condition.   *Ante*, at 839, n. 6.   The Com-
mission sought the deed restriction, however, not to address a generalized
problem inherent in any system of property, but to address the *particular*
problem created by the shifting high-tide line along Faria Beach.   Unlike
the typical area in which a boundary is delineated reasonably clearly, the
very problem on Faria Beach is that the boundary is *not* constant.   The
area open to public use therefore is frequently in question, and, as the dis-
cussion, *supra*, demonstrates, the Commission clearly tailored its permit
condition precisely to address this specific problem.

The Court acknowledges that the Nollans' seawall could provide "a clear
demarcation of the public easement," and thus avoid merely shifting "the
location of the boundary dispute further on to the private owner's land."
*Ibid.*   It nonetheless faults the Commission because every property sub-
ject to regulation may not have this feature.   This case, however, is a chal-

The Court is therefore simply wrong that there is no reasonable relationship between the permit condition and the specific type of burden on public access created by the appellants' proposed development. Even were the Court desirous of assuming the added responsibility of closely monitoring the regulation of development along the California coast, this record reveals rational public action by any conceivable standard.

## II

The fact that the Commission's action is a legitimate exercise of the police power does not, of course, insulate it from a takings challenge, for when "regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922). Conventional takings analysis underscores the implausibility of the Court's holding, for it demonstrates that this exercise of California's police power implicates none of the concerns that underlie our takings jurisprudence.

In reviewing a Takings Clause claim, we have regarded as particularly significant the nature of the governmental action and the economic impact of regulation, especially the extent to which regulation interferes with investment-backed expectations. *Penn Central,* 438 U. S., at 124. The character of the government action in this case is the imposition of a condition on permit approval, which allows the public to continue to have access to the coast. The physical intrusion permitted by the deed restriction is minimal. The public is permitted the right to pass and repass along the coast in an area from the seawall to the mean high-tide mark. App. 46. This area is at its *widest* 10 feet, *id.,* at 61, which means that *even without the permit condition,* the public's right of access permits it to pass on average within a few feet of the seawall. Passage closer to the 8-foot-high rocky seawall will make the

lenge to the permit condition *as applied to the Nollans' property,* so the presence or absence of seawalls on other property is irrelevant.

appellants even less visible to the public than passage along the high-tide area farther out on the beach. The intrusiveness of such passage is even less than the intrusion resulting from the required dedication of a sidewalk in front of private residences, exactions which are commonplace conditions on approval of development.[7] Furthermore, the high-tide line shifts throughout the year, moving up to and beyond the seawall, so that public passage for a portion of the year would either be impossible or would not occur on appellant's property. Finally, although the Commission had the authority to provide for either passive or active recreational use of the property, it chose the least intrusive alternative: a mere right to pass and repass. *Id.*, at 370.[8] As this Court made

[7] See, *e. g., Bellefontaine Neighbors* v. *J. J. Kelley Realty & Bldg. Co.*, 460 S. W. 2d 298 (Mo. Ct. App. 1970); *Allen* v. *Stockwell*, 210 Mich. 488, 178 N. W. 27 (1920). See generally Shultz & Kelley, Subdivision Improvement Requirements and Guarantees: A Primer, 28 Wash. U. J. Urban and Contemp. L. 3 (1985).

[8] The Commission acted in accordance with its Guidelines both in determining the width of the area of passage, and in prohibiting any recreational use of the property. The Guidelines state that it may be necessary on occasion to provide for less than the normal 25-foot-wide accessway along the dry sand when this may be necessary to "protect the privacy rights of adjacent property owners." App. 363. They also provide this advice in selecting the type of public use that may be permitted:

"*Pass and Repass.* Where topographic constraints of the site make use of the beach dangerous, where habitat values of the shoreline would be adversely impacted by public use of the shoreline or where the accessway may encroach closer than 20 feet to a residential structure, the accessway may be limited to the right of the public to pass and repass along the access area. For the purposes of these guidelines, pass and repass is defined as the right to walk and run along the shoreline. This would provide for public access along the shoreline but would not allow for any additional use of the accessway. Because this severely limits the public's ability to enjoy the adjacent state owned tidelands by restricting the potential use of the access areas, this form of access dedication should be used only where necessary to protect the habitat values of the site, where topographic constraints warrant the restriction, or where it is necessary to protect the privacy of the landowner." *Id.*, at 370.

clear in *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 83 (1980), physical access to private property in itself creates no takings problem if it does not "unreasonably impair the value or use of [the] property." Appellants can make no tenable claim that either their enjoyment of their property or its value is diminished by the public's ability merely to pass and repass a few feet closer to the seawall beyond which appellants' house is located.

*PruneYard* is also relevant in that we acknowledged in that case that public access rested upon a "state constitutional . . . provision that had been construed to create rights to the use of private property by strangers." *Id.*, at 81. In this case, of course, the State is also acting to protect a state constitutional right. See *supra*, at 847–848 (quoting Art. X, § 4, of California Constitution). The constitutional provision guaranteeing public access to the ocean states that "the Legislature shall enact such laws as will give *the most liberal construction to this provision* so that access to the navigable waters of this State shall be always attainable for the people thereof." Cal. Const., Art. X, § 4 (emphasis added). This provision is the explicit basis for the statutory directive to provide for public access along the coast in new development projects, Cal. Pub. Res. Code Ann. § 30212 (West 1986), and has been construed by the state judiciary to permit passage over private land where necessary to gain access to the tidelands. *Grupe* v. *California Coastal Comm'n*, 166 Cal. App. 3d 148, 171–172, 212 Cal. Rptr. 578, 592–593 (1985). The physical access to the perimeter of appellants' property at issue in this case thus results directly from the State's enforcement of the State Constitution.

Finally, the character of the regulation in this case is not unilateral government action, but a condition on approval of a development request submitted by appellants. The State has not sought to interfere with any pre-existing property interest, but has responded to appellants' proposal to intensify development on the coast. Appellants themselves chose to

submit a new development application, and could claim no property interest in its approval. They were aware that approval of such development would be conditioned on preservation of adequate public access to the ocean. The State has initiated no action against appellants' property; had the Nollans' not proposed more intensive development in the coastal zone, they would never have been subject to the provision that they challenge.

Examination of the economic impact of the Commission's action reinforces the conclusion that no taking has occurred. Allowing appellants to intensify development along the coast in exchange for ensuring public access to the ocean is a classic instance of government action that produces a "reciprocity of advantage." *Pennsylvania Coal*, 260 U. S., at 415. Appellants have been allowed to replace a one-story, 521-square-foot beach home with a two-story, 1,674-square-foot residence and an attached two-car garage, resulting in development covering 2,464 square feet of the lot. Such development obviously significantly increases the value of appellants' property; appellants make no contention that this increase is offset by any diminution in value resulting from the deed restriction, much less that the restriction made the property less valuable than it would have been without the new construction. Furthermore, appellants gain an additional benefit from the Commission's permit condition program. They are able to walk along the beach beyond the confines of their own property only because the Commission has required deed restrictions as a condition of approving other new beach developments.[9] Thus, appellants benefit both as private landowners and as members of the public from the fact that new development permit requests are conditioned on preservation of public access.

---

[9] At the time of the Nollans' permit application, 43 of the permit requests for development along the Faria Beach had been conditioned on deed restrictions ensuring lateral public access along the shoreline. App. 48.

Ultimately, appellants' claim of economic injury is flawed because it rests on the assumption of entitlement to the full value of their new development. Appellants submitted a proposal for more intensive development of the coast, which the Commission was under no obligation to approve, and now argue that a regulation designed to ameliorate the impact of that development deprives them of the full value of their improvements. Even if this novel claim were somehow cognizable, it is not significant. "[T]he interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." *Andrus* v. *Allard*, 444 U. S. 51, 66 (1979).

With respect to appellants' investment-backed expectations, appellants can make no reasonable claim to any expectation of being able to exclude members of the public from crossing the edge of their property to gain access to the ocean. It is axiomatic, of course, that state law is the source of those strands that constitute a property owner's bundle of property rights. "[A]s a general proposition[,] the law of real property is, under our Constitution, left to the individual States to develop and administer." *Hughes* v. *Washington*, 389 U. S. 290, 295 (1967) (Stewart, J., concurring). See also *Borax Consolidated, Ltd.* v. *Los Angeles*, 296 U. S. 10, 22 (1935) ("Rights and interests in the tideland, which is subject to the sovereignty of the State, are matters of local law"). In this case, the State Constitution explicitly states that no one possessing the "frontage" of any "navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose." Cal. Const., Art. X, §4. The state Code expressly provides that, save for exceptions not relevant here, "[p]ublic access from the nearest public roadway to the shoreline and along the coast shall be provided in new development projects." Cal. Pub. Res. Code Ann. § 30212 (West 1986). The Coastal Commission Interpretative Guidelines make clear that fulfillment of the Commission's constitutional and statutory duty

requires that approval of new coastline development be conditioned upon provisions ensuring lateral public access to the ocean. App. 362. At the time of appellants' permit request, the Commission had conditioned all 43 of the proposals for coastal new development in the Faria Family Beach Tract on the provision of deed restrictions ensuring lateral access along the shore. *Id.*, at 48. Finally, the Faria family had leased the beach property since the early part of this century, and "the Faria family and their lessees [including the Nollans] had not interfered with public use of the beachfront within the Tract, so long as public use was limited to pass and repass lateral access along the shore." *Ibid.* California therefore has clearly established that the power of exclusion for which appellants seek compensation simply is not a strand in the bundle of appellants' property rights, and appellants have never acted as if it were. Given this state of affairs, appellants cannot claim that the deed restriction has deprived them of a reasonable expectation to exclude from their property persons desiring to gain access to the sea.

Even were we somehow to concede a pre-existing expectation of a right to exclude, appellants were clearly on notice when requesting a new development permit that a condition of approval would be a provision ensuring public lateral access to the shore. Thus, they surely could have had no expectation that they could obtain approval of their new development and exercise any right of exclusion afterward. In this respect, this case is quite similar to *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986 (1984). In *Monsanto*, the respondent had submitted trade data to the Environmental Protection Agency (EPA) for the purpose of obtaining registration of certain pesticides. The company claimed that the agency's disclosure of certain data in accordance with the relevant regulatory statute constituted a taking. The Court conceded that the data in question constituted property under state law. It also found, however, that certain of the data had been submitted to the agency after Congress had

made clear that only limited confidentiality would be given data submitted for registration purposes. The Court observed that the statute served to inform Monsanto of the various conditions under which data might be released, and stated:

"If, despite the data-consideration and data-disclosure provisions in the statute, Monsanto chose to submit the requisite data in order to receive a registration, it can hardly argue that its reasonable investment-backed expectations are disturbed when EPA acts to use or disclose the data in a manner that was authorized by law at the time of the submission." *Id.*, at 1006–1007.

The Court rejected respondent's argument that the requirement that it relinquish some confidentiality imposed an unconstitutional condition on receipt of a Government benefit:

"[A]s long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking." *Id.*, at 1007.

The similarity of this case to *Monsanto* is obvious. Appellants were aware that stringent regulation of development along the California coast had been in place at least since 1976. The specific deed restriction to which the Commission sought to subject them had been imposed since 1979 on all 43 shoreline new development projects in the Faria Family Beach Tract. App. 48. Such regulation to ensure public access to the ocean had been directly authorized by California citizens in 1972, and reflected their judgment that restrictions on coastal development represented "'the advantage of living and doing business in a civilized community.'" *Andrus* v. *Allard, supra,* at 67, quoting *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S., at 422 (Brandeis, J., dissenting). The deed restriction was "authorized by law at the

time of [appellants' permit] submission," *Monsanto, supra,* at 1007, and, as earlier analysis demonstrates, *supra,* at 849–853, was reasonably related to the objective of ensuring public access. Appellants thus were on notice that new developments would be approved only if provisions were made for lateral beach access. In requesting a new development permit from the Commission, they could have no reasonable expectation of, and had no entitlement to, approval of their permit application without any deed restriction ensuring public access to the ocean. As a result, analysis of appellants' investment-backed expectations reveals that "the force of this factor is so overwhelming . . . that it disposes of the taking question." *Monsanto, supra,* at 1005.[10]

Standard Takings Clause analysis thus indicates that the Court employs its unduly restrictive standard of police power rationality to find a taking where neither the character of governmental action nor the nature of the private interest affected raise any takings concern. The result is that the Court invalidates regulation that represents a reasonable ad-

---

[10] The Court suggests that *Ruckelshaus* v. *Monsanto* is distinguishable, because government regulation of property in that case was a condition on receipt of a "government benefit," while here regulation takes the form of a restriction on "the right to build on one's own property," which "cannot remotely be described as a 'government benefit.'" *Ante,* at 834, n. 2. This proffered distinction is not persuasive. Both Monsanto and the Nollans hold property whose use is subject to regulation; Monsanto may not sell its property without obtaining government approval and the Nollans may not build new development on their property without government approval. Obtaining such approval is as much a "government benefit" for the Nollans as it is for Monsanto. If the Court is somehow suggesting that "the right to build on one's own property" has some privileged natural rights status, the argument is a curious one. By any traditional labor theory of value justification for property rights, for instance, see, *e. g.,* J. Locke, The Second Treatise of Civil Government 15–26 (E. Gough, ed. 1947), Monsanto would have a superior claim, for the chemical formulae which constitute its property only came into being by virtue of Monsanto's efforts.

justment of the burdens and benefits of development along the California coast.

## III

The foregoing analysis makes clear that the State has taken no property from appellants. Imposition of the permit condition in this case represents the State's reasonable exercise of its police power. The Coastal Commission has drawn on its expertise to preserve the balance between private development and public access, by requiring that any project that intensifies development on the increasingly crowded California coast must be offset by gains in public access. Under the normal standard for review of the police power, this provision is eminently reasonable. Even accepting the Court's novel insistence on a precise *quid pro quo* of burdens and benefits, there is a reasonable relationship between the public benefit and the burden created by appellants' development. The movement of development closer to the ocean creates the prospect of encroachment on public tidelands, because of fluctuation in the mean high-tide line. The deed restriction ensures that disputes about the boundary between private and public property will not deter the public from exercising its right to have access to the sea.

Furthermore, consideration of the Commission's action under traditional takings analysis underscores the absence of any viable takings claim. The deed restriction permits the public only to pass and repass along a narrow strip of beach, a few feet closer to a seawall at the periphery of appellants' property. Appellants almost surely have enjoyed an increase in the value of their property even with the restriction, because they have been allowed to build a significantly larger new home with garage on their lot. Finally, appellants can claim the disruption of no expectation interest, both because they have no right to exclude the public under state law, and because, even if they did, they had full advance notice that new development along the coast is conditioned on provisions for continued public access to the ocean.

Fortunately, the Court's decision regarding this application of the Commission's permit program will probably have little ultimate impact either on this parcel in particular or the Commission program in general. A preliminary study by a Senior Lands Agent in the State Attorney General's Office indicates that the portion of the beach at issue in this case likely belongs to the public. App. 85.[11] Since a full study had not been completed at the time of appellants' permit application, the deed restriction was requested "without regard to the possibility that the applicant is proposing development on public land." *Id.*, at 45. Furthermore, analysis by the same Lands Agent also indicated that the public had obtained a prescriptive right to the use of Faria Beach from the seawall to the ocean. *Id.*, at 86.[12] The Superior Court explicitly stated in its ruling against the Commission on the permit condition issue that "no part of this opinion is intended to foreclose the public's opportunity to adjudicate the possibility that public rights in [appellants'] beach have been acquired through prescriptive use." *Id.*, at 420.

With respect to the permit condition program in general, the Commission should have little difficulty in the future in utilizing its expertise to demonstrate a specific connection between provisions for access and burdens on access produced by new development. Neither the Commission in its report nor the State in its briefs and at argument highlighted the particular threat to lateral access created by appellants'

---

[11] The Senior Lands Agent's report to the Commission states that "based on my observations, presently, most, if not all of Faria Beach waterward of the existing seawalls [lies] *below* the Mean High Tide Level, and would fall in public domain or sovereign category of ownership." App. 85 (emphasis added).

[12] The Senior Lands Agent's report stated:

"Based on my past experience and my investigation to date of this property it is my opinion that the area seaward of the revetment at 3822 Pacific Coast Highway, Faria Beach, as well as all the area seaward of the revetments built to protect the Faria Beach community, if not public owned, has been impliedly dedicated to the public for passive recreational use." *Id.*, at 86.

development project. In defending its action, the State emphasized the general point that *overall* access to the beach had been preserved, since the diminution of access created by the project had been offset by the gain in lateral access. This approach is understandable, given that the State relied on the reasonable assumption that its action was justified under the normal standard of review for determining legitimate exercises of a State's police power. In the future, alerted to the Court's apparently more demanding requirement, it need only make clear that a provision for public access directly responds to a particular type of burden on access created by a new development. Even if I did not believe that the record in this case satisfies this requirement, I would have to acknowledge that the record's documentation of the impact of coastal development indicates that the Commission should have little problem presenting its findings in a way that avoids a takings problem.

Nonetheless it is important to point out that the Court's insistence on a precise accounting system in this case is insensitive to the fact that increasing intensity of development in many areas calls for farsighted, comprehensive planning that takes into account both the interdependence of land uses and the cumulative impact of development.[13] As one scholar has noted:

"Property does not exist in isolation. Particular parcels are tied to one another in complex ways, and property is

---

[13] As the California Court of Appeal noted in 1985: "Since 1972, permission has been granted to construct more than 42,000 building units within the land jurisdiction of the Coastal Commission. In addition, pressure for development along the coast is expected to increase since approximately 85% of California's population lives within 30 miles of the coast." *Grupe* v. *California Coastal Comm'n*, 166 Cal. App. 3d 148, 167, n. 12, 212 Cal. Rptr. 578, 589, n. 12. See also Coastal Zone Management Act, 16 U. S. C. § 1451(c) (increasing demands on coastal zones "have resulted in the loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use, and shoreline erosion").

more accurately described as being inextricably part of a
network of relationships that is neither limited to, nor
usefully defined by, the property boundaries with which
the legal system is accustomed to dealing.   Frequently,
use of any given parcel of property is at the same time
effectively a use of, or a demand upon, property beyond
the border of the user." Sax, Takings, Private Prop-
erty, and Public Rights, 81 Yale L. J. 149, 152 (1971)
(footnote omitted).

As Congress has declared: "The key to more effective protec-
tion and use of the land and water resources of the coastal
zone [is for the states to] develo[p] land and water use pro-
grams for the coastal zone, including unified policies, criteria,
standards, methods, and processes for dealing with land and
water use decisions of more than local significance." 16
U. S. C. § 1451(i).   This is clearly a call for a focus on the
overall impact of development on coastal areas.   State agen-
cies therefore require considerable flexibility in responding
to private desires for development in a way that guarantees
the preservation of public access to the coast.   They should
be encouraged to regulate development in the context of the
overall balance of competing uses of the shoreline.   The
Court today does precisely the opposite, overruling an emi-
nently reasonable exercise of an expert state agency's judg-
ment, substituting its own narrow view of how this balance
should be struck.   Its reasoning is hardly suited to the com-
plex reality of natural resource protection in the 20th cen-
tury.   I can only hope that today's decision is an aberration,
and that a broader vision ultimately prevails.[14]

I dissent.

---

[14] I believe that States should be afforded considerable latitude in regu-
lating private development, without fear that their regulatory efforts will
often be found to constitute a taking.   "If. . . regulation denies the private
property owner the use and enjoyment of his land and is found to effect a
'taking,'" however, I believe that compensation is the appropriate remedy
for this constitutional violation.   *San Diego Gas & Electric Co. v. San*

JUSTICE BLACKMUN, dissenting.

I do not understand the Court's opinion in this case to implicate in any way the public-trust doctrine. The Court certainly had no reason to address the issue, for the Court of Appeal of California did not rest its decision on Art. X, § 4, of the California Constitution. Nor did the parties base their arguments before this Court on the doctrine.

I disagree with the Court's rigid interpretation of the necessary correlation between a burden created by development and a condition imposed pursuant to the State's police power to mitigate that burden. The land-use problems this country faces require creative solutions. These are not advanced by an "eye for an eye" mentality. The close nexus between benefits and burdens that the Court now imposes on permit conditions creates an anomaly in the ordinary requirement that a State's exercise of its police power need be no more than rationally based. See, e. g., *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 466 (1981). In my view, the easement exacted from appellants and the problems their development created are adequately related to the governmental interest in providing public access to the beach. Coastal development by its very nature makes public access to the shore generally more difficult. Appellants' structure is part of that general development and, in particular, it diminishes the public's visual access to the ocean and decreases the public's sense that it may have physical access to the beach. These losses in access can be counteracted, at least in part, by the condition on appellants' construction permitting public passage that ensures access along the beach.

Traditional takings analysis compels the conclusion that there is no taking here. The governmental action is a valid exercise of the police power, and, so far as the record reveals,

---

*Diego*, 450 U. S. 621, 656 (1981) (BRENNAN, J., dissenting) (emphasis added). I therefore see my dissent here as completely consistent with my position in *First English Evangelical Lutheran Church of Glendale* v. *Los Angeles County*, 482 U. S. 304 (1987).

has a nonexistent economic effect on the value of appellants' property. No investment-backed expectations were diminished. It is significant that the Nollans had notice of the easement before they purchased the property and that public use of the beach had been permitted for decades.

For these reasons, I respectfully dissent.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

The debate between the Court and JUSTICE BRENNAN illustrates an extremely important point concerning government regulation of the use of privately owned real estate. Intelligent, well-informed public officials may in good faith disagree about the validity of specific types of land-use regulation. Even the wisest lawyers would have to acknowledge great uncertainty about the scope of this Court's takings jurisprudence. Yet, because of the Court's remarkable ruling in *First English Evangelical Lutheran Church of Glendale* v. *Los Angeles County*, 482 U. S. 304 (1987), local governments and officials must pay the price for the necessarily vague standards in this area of the law.

In his dissent in *San Diego Gas & Electric Co.* v. *San Diego*, 450 U. S. 621 (1981), JUSTICE BRENNAN proposed a brand new constitutional rule.* He argued that a mistake such as the one that a majority of the Court believes that the California Coastal Commission made·in this case should automatically give rise to pecuniary liability for a "temporary taking." *Id.*, at 653–661. Notwithstanding the unprecedented chilling effect that such a rule will obviously have on public officials charged with the responsibility for drafting and implementing regulations designed to protect the envi-

---

*"The constitutional rule I propose requires that, once a court finds that a police power regulation has effected a 'taking,' the government entity must pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation." 450 U. S., at 658.

ronment and the public welfare, six Members of the Court recently endorsed JUSTICE BRENNAN's novel proposal. See *First English Evangelical Lutheran Church, supra.*

I write today to identify the severe tension between that dramatic development in the law and the view expressed by JUSTICE BRENNAN's dissent in this case that the public interest is served by encouraging state agencies to exercise considerable flexibility in responding to private desires for development in a way that threatens the preservation of public resources. See *ante,* at 846–848. I like the hat that JUSTICE BRENNAN has donned today better than the one he wore in *San Diego,* and I am persuaded that he has the better of the legal arguments here. Even if his position prevailed in this case, however, it would be of little solace to land-use planners who would still be left guessing about how the Court will react to the next case, and the one after that. As this case demonstrates, the rule of liability created by the Court in *First English* is a shortsighted one. Like JUSTICE BRENNAN, I hope that "a broader vision ultimately prevails." *Ante,* at 864.

I respectfully dissent.