AMOCO OIL COMPANY, Plaintiff-Appellant and Cross-Appellee, v. THE VILLAGE OF SCHAUMBURG, Defendant-Appellee and Cross-Appellant.

First District (5th Division)    No. 1—94—3648

Opinion filed December 29, 1995.—Rehearing denied February 20, 1996.

John B. Murphey and Robert L. Gamrath III, both of Rosenthal, Murphey, Coblentz & Janega, of Chicago, for appellant.

Jack M. Siegel, of Altheimer & Gray, of Chicago, for appellee.

JUSTICE T. O'BRIEN delivered the opinion of the court:

Plaintiff, Amoco Oil Company (Amoco), filed a two-count complaint against defendant, Village of Schaumburg (Schaumburg), in connection with the conditional granting and subsequent revocation of a special use permit. The gravamen of the complaint centered upon Schaumburg's requirement that Amoco dedicate approximately 20% of its property as a means of securing approval of a zoning application. After Amoco filed suit in the Federal District Court for the Northern District of Illinois, Schaumburg revoked the ordinance in an apparent effort to divest the Federal court of jurisdiction. (*Amoco Oil Co. v. Village of Schaumburg* (N.D. Ill. 1992), No. 91 C 4973.) Amoco then filed the present State action in the circuit court of Cook County.

In count I of its complaint, Amoco sought declaratory and injunctive relief as well as damages arising out of an alleged taking of its

property without just compensation. In count II, Amoco requested a declaration that the subsequent repeal of the permit was arbitrary and unreasonable. Following a bench trial, the circuit court ruled against Amoco on count I, finding no taking in the absence of a physical invasion of the property. However, the circuit court ruled in favor of Amoco on count II, finding Schaumburg's attempt to revoke the permit did not qualify as a reasonable exercise of Schaumburg's legislative authority. The circuit court then ordered Schaumburg to issue all necessary permits upon appropriate application. Both sides appealed.

For the reasons which follow, we hold that the imposition of the dedication requirement did in fact constitute a taking under the Federal Constitution pursuant to the rationale of *Nollan v. California Coastal Comm'n* (1987), 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141, and *Dolan v. City of Tigard* (1994), 512 U.S. 374, 129 L. Ed. 2d 304, 114 S. Ct. 2309. We further hold that Schaumburg acted arbitrarily and capriciously in repealing the original ordinance granting the permit. Accordingly, we reverse the circuit court as to count I, affirm as to count II, and remand the matter for further proceedings consistent with this opinion.

## BACKGROUND

Amoco is the owner of certain property that was at all relevant times improved with an automobile service station and four separate "gasoline pump islands." The property itself is located in a dense commercial area at the northeast corner of Golf Road and Roselle Road in Schaumburg, Illinois. Golf Road is a major arterial highway under the jurisdiction of the Illinois Department of Transportation (IDOT). Roselle Road, on the other hand, is under the jurisdiction of Cook County and the Cook County Department of Highways.

Due to Schaumburg's growth, Golf and Roselle Roads have suffered from severe traffic congestion, experiencing over-design capacity, particularly during the morning and evening "rush hours." As a result, Schaumburg has, since at least 1984, undertaken to redesign the intersection of Golf and Roselle Roads. To that end, Schaumburg, the Village of Hoffman Estates, Cook County and IDOT entered into an agreement in 1988 whereby IDOT would conduct a "Phase I" study, *i.e.*, a preliminary engineering analysis of possible roadway improvements. The study contemplated widening both roads by adding extra lanes of through traffic as well as dual left-turn and right-turn lanes at the intersection adjacent to Amoco's property.

Meanwhile, in 1989, representatives from Amoco met with Schaumburg staff members to discuss possible improvements to the

existing service station. At that time, the property was zoned B-2, general retail business district. The station itself was classified as a "Type A" automobile service station, one which only sells gasoline and services automobiles. Under its proposed zoning application, Amoco sought the following improvements:

"A. Razing the existing building and replacing it with a prototypical food shop structure;

B. reconfiguring the pump islands to improve both onsite [sic] circulation as well as ingress and egress, and installing new, modern fuel dispensers at the station[;]

C. eliminating two of the four driveways on the Subject Property, those being the far west driveway on Golf Road and the far south driveway on Roselle Road;

D. extensively landscaping the site; and

E. providing an overhead canopy to better illuminate the facility and shield customers from the elements."

Such improvements, however, required a "Type C" classification and, therefore, Amoco needed to obtain a special use permit and site plan approval.

At some point during the pre-application meetings, Schaumburg staff members indicated that Amoco would be required to dedicate approximately 20 feet of its property along both Golf and Roselle Roads as a condition to approval of its application. Schaumburg also insisted upon the dedication of a 40-foot by 40-foot triangular section at the southwest corner of the subject property. Although Amoco objected to the dedication requirement at that time, it nevertheless submitted a formal zoning application for a special use permit and site plan approval in late 1990.

Subsequently, the village Zoning Board of Appeals set a public hearing on Amoco's application for February 20, 1991. In the meantime, the village director of planning and the village director of engineering issued a "Project Review Group Report." The report recommended approving Amoco's application because, "[g]iven the traffic carrying capacity of Golf Road and Roselle Road, the proposed improvements to the intersection and the fact that the property is surrounded by existing low to moderate intensity commercial uses, Staff believes the conversion to a Type 'C' automobile service station will not be detrimental to surrounding land uses." Despite the fact that the report also noted that the proposed redevelopment "is an appropriate use for this site given its current use and the surrounding commercial development," the report suggested elsewhere that the Zoning Board of Appeals "[d]enote the additional land required for right-of-way purposes as a 'dedication' and not a 'taking.' "

At the hearing before the zoning board, Amoco again objected to the imposition of the dedication requirement. In particular, Amoco explained that the need for any additional right-of-way would not be caused by its proposed redevelopment of its property, but rather by the current deficiencies in the design and traffic capacity of the existing roadways. Amoco also pointed out that the planned dedication amounted to over 20% of the property's total square footage. As a result, the zoning board recommended approving Amoco's zoning application without the dedication requirement.

On June 25, 1991, the village board of trustees held a meeting to consider the zoning board's decision. At the meeting, the board of trustees, although finding that Amoco satisfied the standards for the special use, rejected the recommendation that Amoco's application for redevelopment be approved without the dedication requirement. Instead, on July 9, 1991, the board of trustees enacted Ordinance No. 91—78, "AN ORDINANCE GRANTING SPECIAL USE FOR A TYPE 'C' AUTOMOBILE SERVICE STATION, FRONT YARD SETBACK VARIATION AND SITE PLAN APPROVAL." This ordinance was subject to the following condition:

"Prior to the issuance of a building permit, the petitioner [Amoco] shall submit for review and approval from the Village of Schaumburg a Final Plat of Subdivision for the property. Upon said Plat, the petitioner shall also provide the dedication of twenty-eight (28) feet of additional right-of-way along Golf Road and ten (10) feet of additional right-of-way along Roselle Road, as well as a forty (40) foot triangular section of right-of-way immediately contiguous to the intersection."

In response, Amoco filed suit in the United States District Court for the Northern District of Illinois. The district court, however, denied a motion for preliminary injunction on the grounds that Amoco had a sufficient remedy at law for money damages. Nevertheless, the court noted, in passing, that "if the public officials know that their actions are not supported by the law and persist anyway, driven by some impression that they can attach these conditions because zoning ordinances constitute some kind of public favor to be dispensed, that is certainly against public policy."

Shortly thereafter, the board of trustees proposed adopting Ordinance No. 91—153, "AN ORDINANCE REPEALING ORDINANCE NO. 91—78, GRANTING SPECIAL USE FOR A TYPE 'C' AUTOMOBILE SERVICE STATION, VARIATION AND SITE PLAN APPROVAL." On October 30, 1991, the zoning board, as required by law, conducted a public hearing on the proposed "repealer ordinance." The board of trustees eventually passed the repealer ordinance.

On September 9, 1992, the district court dismissed the Federal action on the grounds that Amoco had an appropriate remedy in State court. One month later, Amoco filed the present action before the circuit court of Cook County, seeking, among other things, declaratory and injunctive relief. Amoco asserted that conditioning a special use permit upon dedication amounted to a taking of property without just compensation in violation of both the Federal and the State Constitutions. Amoco also claimed Schaumburg's adoption of the repealer ordinance was an arbitrary and unreasonable use of municipal power and, thus, violated Amoco's constitutional right to due process. The case ultimately proceeded to trial.[1]

At trial, Amoco called as a witness Clifford Rudd, a project engineer responsible for the construction of service stations. Rudd testified that he prepared the site plan drawings that were later submitted to Schaumburg as part of the zoning application process. Rudd explained that, because of conditions already existing on Golf and Roselle Roads, Amoco was aware that both roads would have to be widened in the future and that, therefore, Amoco proposed setting its improvements farther back in its lot. In this way, business at the new station would not be interrupted once IDOT condemned the property. The set back would also prevent IDOT from incurring any additional expense in reimbursing Amoco for having to move the improvements. Finally, Rudd confirmed that Schaumburg officials required Amoco to dedicate a portion of its property even before Amoco submitted its formal application.

David B. Miller, an expert traffic engineer at Metro Transportation Group, also testified on Amoco's behalf. Amoco retained Miller and his firm in 1990 to conduct certain comprehensive traffic impact studies in connection with Amoco's proposed redevelopment of the property. Miller estimated that, under a worse case scenario, the intended improvements would increase vehicle movements *on the property* by 25%.[2] This projection was based upon the fact that typically 70% of traffic flow at a gasoline station is "impulse" traffic, *i.e.*, traffic already present on the streets. As a result, Amoco's proposed improvements would actually have a negligible impact on the traffic flow on Golf and Roselle Roads. Specifically, Miller predicted an

---

[1]The parties agreed to bifurcate the trial, reserving the issue of damages..

[2]Elsewhere in his testimony, Miller indicated that the proposed removal of two driveways closest to the intersection and the reconfiguration of the pump islands would facilitate the additional ingress and egress to the station and, therefore, would enhance the intersection and provide additional on-site and arterial safety.

increase in traffic volume at the intersection resulting from the proposed improvements of between .2% and .4%. The need for widening the roads, according to Miller, preexisted Amoco's proposed improvements.

On cross-examination, Miller acknowledged that Schaumburg conducted a traffic count in 1993 that indicated a larger increase in street traffic volume than Miller's own studies, and that IDOT was considering a greater dedication of right-of-way. Miller nevertheless affirmed the findings of his own studies.

Kenneth Hemstreet, the chief of the project and environmental studies section at IDOT's Bureau of Programming, testified regarding the "Golf-Higgins-Roselle Triangle Project." This project entails the reconstruction of a two-mile stretch along Golf, Higgins and Roselle Roads, respectively. Phase I of the project, *i.e.*, the preliminary engineering analysis, was completed in December of 1993 and, with regard to the intersection of Golf and Roselle Roads, consisted of the following planned improvements: (i) replacing the current two lanes with three lanes in each direction; (ii) increasing the current 16-foot median with a 28-foot median; and (iii) adding an additional left-turn lane for each road as well as a single right-turn lane.[3] Finally, Hemstreet noted that Amoco's proposed improvements had no effect on the need to add lanes to Golf and Roselle Roads. Indeed, IDOT recommended widening Golf and Roselle Roads regardless of Amoco's proposal.

Amoco also called Allen Kracower, a professional urban planner, landscape architect, and real estate consultant. Kracower confirmed that the area in question was heavily commercial in nature and that the current zoning of the Amoco property was consistent with the contiguous properties. In Kracower's opinion, Amoco's proposed redevelopment was compatible with the surrounding land uses. In fact, after extensively surveying the entire Village of Schaumburg to determine the total number of gasoline service stations and automobile service facilities, Kracower concluded that the Amoco proposal was the highest and best use for the subject property. Furthermore, the intended use of the property complied with each of the special use standards set forth in section 4.3—1 of Schaumburg's

---

[3]Hemstreet further stated that IDOT was awaiting an appropriation of State funds for land acquisition and roadway construction. Walter Kos, a civil engineer employed by IDOT who is responsible for project funding, similarly testified that the corner of Golf and Roselle Roads was in IDOT's five-year improvement program and the State funding was still pending at the time of trial.

general zoning ordinance; namely, the providing of a service or facility of the public's convenience that is not detrimental to the public's health, safety and morals.

George Longmeyer, Schaumburg's village manager, testified as an adverse witness under section 2—1102 of the Code of Civil Procedure. (735 ILCS 5/2—1102 (West 1992).) Longmeyer admitted that, after having reviewed Amoco's application and information relating to the construction plans, he sent a "general comment document" to the Village planning department. The comment document included a handwritten note from Longmeyer asking, "Do we need additional R-O-W [right-of-way]? If so, can we get it, i.e., widening of Golf and Roselle Road[s]?" He further stated that Schaumburg had a practice of using the zoning process to secure additional right-of-ways.[4]

Amoco also called Thomas Dabareiner, senior transportation planner for the Village of Schaumburg—and Schaumburg's own traffic impact expert. Although he himself did not conduct any traffic impact studies, Dabareiner stated that the need for roadway improvements at the intersection in question was unrelated to Amoco's proposal. He further acknowledged that the engineering studies calling for the widening of Golf and Roselle Roads were prepared prior to Amoco's planned redevelopment.

Finally, Thomas Koenig, Schaumburg's director of planning, confirmed that Schaumburg had a policy of requiring dedications as a condition of land use permits without regard to whether the need for the exaction related to the proposed use of the property. He acknowledged that Amoco's proposal constituted a significant improvement over the current use of property in terms of traffic impact and landscaping. In the end, Koenig initiated the repealer ordinance in order to facilitate dismissal of the Federal litigation.

At the conclusion of the trial, the circuit court ruled against Amoco on count I with respect to the takings issue. The court first noted that the "[t]est to be applied *** in determining whether real estate has been taken for public use within the meaning of our constitution, is whether there has been an actual physical invasion of the tangible property." (*Horn v. City of Chicago* (1949), 403 Ill. 549, 554, 87 N.E.2d 642, *cert. denied & appeal denied* (1950), 338 U.S. 940, 94 L. Ed. 580, 70 S. Ct. 429.) The court then remarked that Schaumburg had never actually physically invaded the property and, therefore, the dedication requirement did not constitute a taking of property.

---

[4]Al Larson, the Village President, likewise conceded that he supported the dedication requirement in order to obtain as much land as possible in order to expedite IDOT's Golf-Higgins-Roselle Triangle Project.

As to the zoning issue in count II, the circuit court observed that a municipality may adopt and amend a zoning ordinance as an exercise of police power in order to protect and promote the public welfare. However, the court found that in this case Schaumburg's attempt to revoke the permit was pretextual and served no public purpose. Accordingly, the court held that the repealer ordinance was void under *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65, and further ordered Schaumburg to issue all necessary permits to Amoco in connection with the proposed construction.

On appeal, Amoco submits that the circuit court should have ruled that the dedication requirement constitutes a taking despite the fact that Schaumburg never actually "physically" invaded the property. Amoco further argues that the repealer ordinance was merely a transparent litigation tactic used to divest the Federal court of continuing jurisdiction and, therefore, the circuit court correctly found that Schaumburg abused its police power. We agree in both respects.

## ANALYSIS

■ The fifth amendment to the United States Constitution provides that private property shall not be taken for public use without just compensation. (U.S. Const., amend. V.) This restriction has been made applicable to the States through the fourteenth amendment. (*Chicago, Burlington, & Quincy R.R. Co. v. City of Chicago* (1897), 166 U.S. 226, 241, 41 L. Ed. 979, 986, 17 S. Ct. 581, 586.) Article I, section 15, of the Illinois Constitution contains a similar restriction. Ill. Const. 1970, art. I, §15.

Nevertheless, a municipality may exact some forms of land appropriation without running afoul of either the State or Federal taking clause. (See, *e.g., Agins v. Tiburon* (1980), 447 U.S. 255, 260, 65 L. Ed. 2d 106, 111-12, 100 S. Ct. 2138, 2141.) Even so, the government's authority to do so is still circumscribed by the fifth and fourteenth amendments. For example, where a municipality appropriates private property through the dedication of an easement or a right-of-way, a taking may occur requiring compensation. (*Sparks v. Douglas County* (1955), ____ Wash. 2d ____, ____, 904 P.2d 738, 741-42.) As the United States Supreme Court reiterated in *Dolan v. City of Tigard* (1994), 512 U.S. 374, 385, 129 L. Ed. 2d 304, 316, 114 S. Ct. 2309, 2317, "[u]nder the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretion-

ary benefit conferred by the government where the property sought has little or no relationship to the benefit."

In *Dolan*, the Supreme Court considered the delicate balance between a citizen's right to be compensated when private property is taken for public use and the government's right to regulate land use *vis-a-vis* the acceptable exercise of the police power. In that case, the owner of a plumbing and electric supply store applied to the City of Tigard Planning Commission for a building permit. The purpose of the permit was to improve the existing building and pave a parking lot. The planning commission approved the application, but only upon the condition that petitioner dedicate approximately 10% of her property as a public greenway and pedestrian/bicycle pathway.

The store owner eventually challenged the dedication requirement on the grounds that her property had been taken without just compensation. The Supreme Court agreed in theory, holding that the exaction could amount to a taking if the reason for the dedication was unrelated to the proposed use of the property. However, because the record did not contain any specific "findings" upon the issue, the Court remanded the matter for further proceedings. Nevertheless, the Court in *Dolan* did establish the appropriate analytical framework for determining whether a taking has occurred where a municipality grants a permit subject to a dedication of the property.

■ In reaching its decision, the Supreme Court initially noted that "[a] land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not den[y] an owner economically viable use of his land.' *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S. Ct. 2138, 2141, 65 L. Ed. 2d 106 (1980)." (*Dolan*, 512 U.S. at 385, 129 L. Ed. 2d at 316, 114 S. Ct. at 2316.) The Court, however, distinguished *Agins* and its line of cases from other cases requiring the dedication of property as a prerequisite to permit approval:

> "The sort of land use regulations discussed in the cases just cited, however, differ in two relevant particulars from the present case. First, they involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city." *Dolan*, 512 U.S. at 385, 129 L. Ed. 2d at 316, 114 S. Ct. at 2316.

The Supreme Court thereafter enunciated a two-part test for determining under what circumstances a condition in a building permit is constitutional. First, a court must ascertain whether there

exists an "essential nexus" between a legitimate State interest and the condition. (*Nollan v. California Coastal Comm'n* (1987), 483 U.S. 825, 837, 97 L. Ed. 2d 677, 689, 107 S. Ct. 3141, 3148.) If such a nexus does exist, a court must then decide whether the condition demanded by the government bears the "required degree of connection" to the anticipated impact of the proposed development. *Dolan*, 512 U.S. at 385, 129 L. Ed. 2d at 317, 114 S. Ct. at 2317.

The first part of the test, *i.e.*, the determination of a nexus, requires no advanced degree of analysis and is best illustrated by the seminal case of *Nollan v. California Coastal Comm'n* (1987), 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141. In *Nollan*, the California Coastal Commission demanded a lateral public easement across private beachfront property in exchange for a demolition and construction permit. Upon review, the Supreme Court held the condition unconstitutional on the ground that there was no essential nexus between the condition and the proposed construction of a three-bedroom house. The Court there noted, "[i]t is quite impossible to understand how a requirement that people already on the public beaches be able to walk across the [petitioner's] property reduces any obstacles to viewing the beach created by the new house." (*Nollan*, 483 U.S. at 838, 97 L. Ed. 2d at 690, 107 S. Ct. at 3149.) In other words, as the *Dolan* Court explained:

> "How enhancing the public's ability to 'traverse to and along the shorefront' served the same governmental purpose of 'visual access to the ocean' from the roadway was beyond our ability to countenance. The absence of a nexus left the Coastal Commission in the petition of simply trying to obtain an easement through gimmickry, which converted a valid regulation of land into 'an out-an-out plan of extortion.'" *Dolan*, 512 U.S. at 387, 129 L. Ed. 2d at 317-18, 114 S. Ct. at 2317, quoting *Nollan*, 483 U.S. at 837, 97 L. Ed. 2d at 689, 107 S. Ct. at 3148, quoting *J.E.D. Associates, Inc. v. Town of Atkinson* (1981), 121 N.H. 581, 584, 432 A.2d 12, 14-15.

In essence, then, under the first part of the test, a court must merely determine whether in fact some logical connection or relationship exists between the proposed use of the property and the condition which the government seeks to impose. It is the second part of the *Dolan* test, *i.e.*, the required degree of connection, which presents more formidable difficulties and which is at the heart of this case.

■ After reviewing the decisions from several State courts, including *Pioneer Trust & Savings Bank v. Village of Mount Prospect* (1961), 22 Ill. 2d 375, 176 N.E.2d 799, the *Dolan* Court settled upon the "rea-

sonable relationship" test adopted by a majority of jurisdictions.[5] Under this approach, a municipality must show a reasonable relationship between the required dedication and the impact of the proposed development. However, the Court rephrased the test in terms of "rough proportionality" so as to avoid confusion with the "rational basis" test found in equal protection jurisprudence. The Court concluded, "[w]e think a term such as 'rough proportionality' best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391, 129 L. Ed. 2d at 320, 114 S. Ct. at 2319-20.

Despite the fact that *Dolan* requires a court to scrutinize the required degree of connection between the exaction and the impact of the development, *Dolan* itself does not represent a seismic departure from traditional takings jurisprudence. In fact, from an analytical point of view, *Dolan* merely reflects the culmination of a logical progression of the unanswered question in *Nollan, i.e.*, if there is a nexus, just how compelling must the nexus be? *Dolan* simply tells us that the imposition of the dedication must be roughly proportionate to the property's intended use.

Thus, in order for the exaction at issue here to pass constitutional muster under the Federal Constitution, the dedication required by

---

[5]In *Pioneer Trust*, our supreme court developed the "specifically and uniquely attributable" test. Under this standard, the government must demonstrate that the imposition of the condition is directly proportional to the specifically created need, lest the exaction be deemed "a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations." (*Pioneer Trust*, 22 Ill. 2d at 381.) In so holding, the court in *Pioneer Trust* found support in *Rosen v. Village of Downers Grove* (1960), 19 Ill. 2d 448, 167 N.E.2d 230, which in turn relied upon *Ayres v. City Council of Los Angeles* (1949), 34 Cal. 2d 31, 207 P.2d 1. We note, however, that the California Supreme Court has since criticized our supreme court for relying on *Ayres*. (See *Associated Home Builders v. City of Walnut Creek* (1971), 4 Cal. 3d 633, 644, 484 P.2d 606, 615, 94 Cal. Rptr. 630, 639.) At any rate, the United States Supreme Court rejected the "specifically and uniquely attributable" approach because the Court did not "think the Federal Constitution require[d] such exacting scrutiny, given the nature of the interests involved." (*Dolan*, 512 U.S. at 390, 129 L. Ed. 2d at 319, 114 S. Ct. at 2319.) Therefore, the "specifically and uniquely attributable" test enumerated in *Pioneer Trust* is no longer to be followed when construing the Federal Constitution. However, it remains controlling with respect to our own constitution until the Illinois Supreme Court speaks again on the issue.

Schaumburg must be roughly proportionate to the razing of the current Amoco station, the erection of a "prototypical food shop," the reconfiguration of the "pump islands," the elimination of two driveways, and the addition of an overhead canopy. That dedication consists of 28 feet of additional right-of-way along Golf Road and 10 feet of additional right-of-way along Roselle Road, as well as a 40-foot triangular section of right-of-way immediately contiguous to the intersection.

Schaumburg contends that "the nexus would have existed because the dedication requirement originally imposed related to the state interest of the highway improvement. The proportionality existed because the dedication was directly related to the land sought to be improved, by the special use." This rather specious contention, however, is belied by the record in this case. After having reviewed the evidence submitted at trial, the circuit court stated at length:

> "The Village [Schaumburg] has argued that both [the] dedication requirement and the revocation of the special use permit were necessary to protect [the] public welfare. The dedication requirement would serve to alleviate traffic problems, and the repeal of the ordinance was in order to ensure that Schaumburg had an adequate number of service stations. However, the evidence presented at trial underscored the insignificance of these so[-]called concerns.
>
> Metra Transportation engineering firm which conducted an analysis of the Amoco proposal found that the Golf-Roselle intersection could adequately accommodate any new traffic[,] that any such additional traffic would be minimal. Thomas Debarener [sic], Transportation Planner for the Village testified that upon review [of] this assessment, he did not object to Metra's findings.
>
> Moreover, Mr. Koenig, Head of the Schaumburg Planning Commission testified that the Village never conducted a traffic study in connection with the property dedication requirement.
>
> * * *
>
> In sum, the Village has offered nothing to suggest that the denial of the special use permit serves to protect the public welfare. In [sic] contrary, the issue of increasing traffic congestion and the need for additional service stations amounts [sic] to little more than pretextual excuses offered subsequent to the enactment of the repealer ordinance, and in order to insulate the Village from claims that it act[ed] in retaliation for Amoco's failure to concede to the dedication requirement and that it wielded its zoning power unreasonably.
>
> Therefore, the evidence shows that no public purpose was served by the initial dedication requirement or by the repeal[er] ordinance."

We acknowledge that the circuit court made these comments in connection with its ruling on count II. Nevertheless, they highlight the fact that Schaumburg attempted to expropriate over 20% of Amoco's property without a legitimate reason. In fact, the record is replete with evidence showing that the required dedication had little or no relationship to the anticipated impact of the proposed development. For example, in addition to the testimony cited by the circuit court, Kenneth Hemstreet also testified that Amoco's proposed improvements would have had no effect on the need to increase the number of lanes for both Golf and Roselle Roads. In fact, according to Hemstreet, IDOT recommended widening the streets notwithstanding the redevelopment of Amoco's property.

Despite this evidence, the circuit court nevertheless found that Schaumburg's actions did not result in a taking of Amoco's property solely because there was no actual physical invasion of tangible property. In reaching this conclusion, the circuit court relied exclusively on *Horn v. City of Chicago* (1949), 403 Ill. 549, 87 N.E.2d 642, *cert. denied & appeal denied* (1950), 338 U.S. 940, 94 L. Ed. 429, 70 S. Ct. 429. We find the factual context of *Horn*, however, too far removed from the instant case to be controlling.

In *Horn*, the owners of private property sought to recover damages from the City of Chicago arising out of the city's construction of the Wabash Avenue viaduct. The construction itself only abutted plaintiffs' property and therefore did not result in any physical invasion of the property. The supreme court denied relief, noting that "[t]he test applied by this court and also by the Federal court, in determining whether real estate has been taken for public use within the meaning of our constitution, is whether there has been an actual physical invasion of the tangible property." (*Horn*, 403 Ill. at 554.) In support of this proposition, the court cited *People ex rel. Pratt v. Rosenfield* (1948), 399 Ill. 247, 77 N.E.2d 697, *Kane v. City of Chicago* (1945), 392 Ill. 172, 64 N.E.2d 506, *People ex rel. Tyson v. Kelly* (1942), 379 Ill. 297, 40 N.E.2d 510, *Cuneo v. City of Chicago* (1942), 379 Ill. 488, 41 N.E.2d 473, *Barnard v. City of Chicago* (1915), 270 Ill. 27, 110 N.E. 407, *Otis Elevator Co. v. City of Chicago* (1914), 263 Ill. 419, 105 N.E. 338, *Schroeder v. City of Joliet* (1901), 189 Ill. 48, 59 N.E. 550, and *Northern Transportation Co. v. City of Chicago* (1879), 99 U.S. 635, 25 L. Ed. 336. (*Horn*, 403 Ill. at 554.) However, the court in *Horn* immediately pointed out that, in each of the cases cited, there had been no attempt by the sovereign authority to appropriate or use the abutting owner's property for public purposes.

In contrast, Schaumburg here attaches a dedication requirement to the issuance of a special use permit which, if accepted, would

result in the loss of 20% of Amoco's property. Thus, unlike *Horn*, which merely involved a potential decline in value of an owner's abutting property as a result of a municipality's development of its own property, there is an actual taking of Amoco's property for public use. To be sure, the exaction of property in this case is the quintessential physical invasion of private property.[6] It is not simply a reduction in, or limitation upon, Amoco's use of its property, but it is a permanent loss of the property itself. As such, the dedication requirement here necessarily strikes at the cornerstone of the takings clause, and is exactly the type of exaction which the courts have repeatedly subjected to a takings analysis. *Nollan v. California Coastal Comm'n* (1987), 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141; *Dolan v. City of Tigard* (1994), 512 U.S. 374, 129 L. Ed. 2d 304, 114 S. Ct. 2309; *Sparks v. Douglas County* (1995), ___ Wash. 2d ___, 904 P.2d 738; *Schultz v. City of Grants Pass* (1994), 131 Or. App. 220, 884 P.2d 569; *Hernando County v. Budget Inns of Florida, Inc.* (Fla. Dist. Ct. App. 1990), 555 So. 2d 1319; *Rohn v. City of Visalia* (1989), 214 Cal. App. 3d 1463, 263 Cal. Rptr. 319.

Schaumburg nevertheless insists that *Dolan* and its progeny did not apply to the present case on the grounds that its actions were purely legislative in nature rather than adjudicative. Schaumburg thus apparently believes that it may skirt its obligation to pay compensation when taking private property for public use merely by having the village board of trustees pass an "ordinance" rather than having a planning commission issue a permit. We disagree.

In *Parking Association of Georgia, Inc. v. City of Atlanta* (1994), 264 Ga. 764, 450 S.E.2d 200, *cert. denied* (1995), 515 U.S. 116, 132 L. Ed. 2d 273, 115 S. Ct. 2268, the City of Atlanta enacted a zoning ordinance pertaining to parking lots with 30 or more spaces in several downtown and midtown zoning districts. The ordinance required minimum barrier curbs and certain specified landscaping. The purpose of the ordinance was to improve the city's aesthetic appeal, promote public safety, and ameliorate problems with air quality and water run off. The supreme court of Georgia upheld the ordinance under State law. More important for present purposes, however, the

---

[6]See *Clajon Production Corp. v. Petera* (10th Cir. 1995), 70 F.3d 1566, 1578 ("*Nollan* and *Dolan* essentially view the conditioning of a permit based on the transfer of a property interest—*i.e.,* an easement—as tantamount to a physical occupation of one's land. *** Thus, we believe that *Nollan* and *Dolan* are best understood as extending the analysis of complete physical occupation cases to those situations in which the government achieves the same end (*i.e.,* the possession of one's physical property) through a conditional permitting procedure").

court also held that the ordinance did not constitute a taking even under the "federal takings analysis." Specifically, the court observed in a footnote:

"Plaintiff's reliance upon *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994), is misplaced. In that case, the city required an applicant for a building permit to deed portions of her property to the city. The Supreme Court held the required dedication violated the Takings Clause because the city did not 'make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the development.' *Id.* at 391, 114 S. Ct. at 2319. Here the city made a legislative determination with regard to many landowners and it simply limited the use the landowners might make of a small portion of their lands. Moreover, the city demonstrated a 'rough proportionality' between the requirements and objectives of the ordinance." *Parking Association of Georgia*, 264 Ga. at 766 n.3, 450 S.E.2d at 203 n.3.

The plaintiff, however, subsequently appealed to the United States Supreme Court on writ of *certiorari*. Although a majority of the Court denied the writ (*Parking Association of Georgia, Inc. v. City of Atlanta* (1995), 515 U.S. 1116, 132 L. Ed. 2d 273, 115 S. Ct. 2268), Justice Thomas, with whom Justice O'Connor joined, issued a written dissent. In the dissent, Justice Thomas initially pointed out that the lower courts are in conflict over whether *Dolan*'s test should be applied in cases where the alleged taking occurs through an act of the legislature. In addition to *Parking Association of Georgia*, the Federal district court in *Harris v. City of Wichita* (D. Kan. 1994), 862 F. Supp. 287, concluded that *Dolan* was inapposite and the less stringent *Agins* standard should apply.[7] On the other hand, both *Trimen Development Co. v. King County* (1994), 124 Wash. 2d 261, 877 P.2d 187, and *Manocherian v. Lenox Hill Hospital* (1994), 84 N.Y.2d 385, 643 N.E.2d 479, 618 N.Y.S.2d 857, *cert. denied* (1995), 514 U.S. 1109, 131 L. Ed. 2d 853, 115 S. Ct. 1961, applied *Dolan* to a purported legislative taking. Justice Thomas then wrote:

"It is hardly surprising that some courts have applied *Tigard* [*i.e., Dolan*'s] rough proportionality test even when considering a legislative enactment. It is not clear why the existence of a taking should turn on the type of governmental entity responsible for the taking. A city council can take property just as well as a planning

---

[7]See also *San Mateo County Coastal Landowners' Association v. San Mateo* (1995), 38 Cal. App. 4th 523, 45 Cal. Rptr. 2d 117; *Home Builder's Association v. City of Scottsdale* (1995), 183 Ariz. 243, 902 P.2d 1347; *Waters Landing Ltd. Partnership v. Montgomery County* (1994), 337 Md. 15, 650 A.2d 712.

commission can. Moreover, the general applicability of the ordinance should not be relevant in a takings analysis. If Atlanta had seized several hundred homes in order to build a freeway, there would be no doubt that Atlanta had taken property. The distinction between sweeping legislative takings and particularized administrative takings appears to be a distinction without a constitutional difference." *Parking Association of Georgia, Inc. v. Atlanta,* 515 U.S. at 1117-18, 132 L. Ed. 2d at 274, 115 S. Ct. at 2268-69 (Thomas, J., dissenting).

Although not binding as precedent, we find Justice Thomas' comments particularly persuasive and consonant with the rationale underlying *Dolan* and similar cases. Certainly, a municipality should not be able to insulate itself from a takings challenge merely by utilizing a different bureaucratic vehicle when expropriating its citizen's property.

In addition, we also note that the so-called "ordinance" at issue here did not itself reflect a uniformly applied legislative policy. Indeed, the dedication requirement was clearly site-specific and adjudicative in character. As such, even if we were to recognize the distinction between legislative and adjudicative actions, which we are not inclined to do under the circumstances of this case, we would still apply the two-part approach set forth in *Dolan,* as the court did in *Schultz v. City of Grants Pass* (1994), 131 Or. App. 220, 884 P.2d 569.

In *Schultz,* a strikingly similar case, the City of Grants Pass approved an application to partition a parcel of private property subject to a dedication requirement. Specifically, the approved application required the property owner to dedicate a 10-foot right-of-way along the portion of both parcels abutting Beacon Drive, a 25-foot right-of-way along the portion of both parcels abutting Savage Street, as well as an unspecified footage sufficient enough "to round the intersection." The property owner challenged the city's actions under the Federal takings clause. The trial court entered judgment in favor of the city, and petitioner appealed.

In reversing the trial court, the appellate court rejected the city's contention that *Dolan* does not apply. The city had argued that "because the relevant ordinances *require* the imposition of such conditions, the decision to do so is, in reality, a legislative one." (Emphasis in original.) (*Schultz,* 131 Or. App. at 227, 884 P.2d at 573.) Instead, the court stressed:

> "[T]he character of the restriction remains the type that is subject to the analysis in *Dolan.* In drawing its distinction between the legislative land use decisions that are entitled to a presumption of

validity and the exactions that are not, the Supreme Court noted that what triggers the heightened scrutiny of exactions is the fact that they are 'not simply a limitation on the use' to which an owner may put his or her property, but rather a requirement that the owner deed portions of the property to the local government. [Citation.] That is precisely the nature of the exaction imposed by the city in this case." (*Schultz*, 131 Or. App. at 227, 884 P.2d at 573.)

It is also precisely the nature of the exaction in the instant case.

Applying *Dolan*, the court in *Schultz* went on to hold the exactions did not satisfy the rough proportionality requirement because "an increase of eight vehicle trips on Beacon Drive and Savage Street each day hardly justifies requiring petitioners to part with 20,000 square feet of their land without compensation. That does not comport with what the Supreme Court meant by 'rough proportionality.' " *Schultz*, 131 Or. App. at 228, 884 P.2d at 573; see also *J.C. Reeves Corp. v. Clackamas County* (1994), 131 Or. App. 615, 887 P.2d 360.

■ Like the court in *Schultz*, we find that Schaumburg's exaction of over 20% of Amoco's property on the basis of a *de minimis* increase in street traffic—0.4%—does not correspond with the slightest notions of rough proportionality. Clearly, because we find that the dedication requirement does not satisfy the more lenient rough proportionality test for the Federal Constitution, it follows that it also did not satisfy the specifically and uniquely attributable approach with respect to the State Constitution. *Pioneer Trust & Savings Bank v. Village of Mount Prospect* (1961), 22 Ill. 2d 375, 176 N.E.2d 799.

At any rate, relying on *Goffinet v. County of Christian* (1976), 65 Ill. 2d 40, 357 N.E.2d 442, Schaumburg proclaims that Amoco's refusal to unconditionally "accept" the dedication requirement terminated the special use permit. We disagree.

In *Goffinet*, our supreme court held that where a zoning enforcing officer has declared that a holder of a *validly* enacted special use permit is no longer utilizing the property in accordance with conditions set forth in the permit, the use terminates and the property reverts to its prior zoning classification. (*Goffinet*, 65 Ill. 2d at 53.) We simply fail to see the relevance of *Goffinet*. Amoco has not been permitted to redevelop the property as it intended, and thus, obviously, a zoning enforcing officer has not declared Amoco in violation of its special use permit. Indeed, the very issue in this case is whether Schaumburg has in fact enacted a *valid* special use permit. How Amoco's unwillingness to part with 20% of its property without

receiving its constitutionally mandated just compensation is the equivalent of an enforcing officer's declaration of noncompliance is beyond our comprehension.

In sum, we hold that Schaumburg's attempted exaction of 28 feet of right-of-way along Golf Road and 10 feet of right-of-way along Roselle Road, as well as the 40-foot triangular section of right-of-way adjacent to the intersection, constitutes a taking under both the fifth amendment of the United States Constitution and article I, section 15, of the Illinois Constitution.

■ We next address whether the circuit court erred in ruling that the repealer ordinance was an arbitrary and capricious act and therefore did not constitute a legitimate exercise of Schaumburg's police power. In this regard, Schaumburg submits that in "judging the propriety of a denial of the special use here [in other words, the repealer ordinance], the trial court was to utilize [which it did] the criteria set forth in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, [145 N.E.2d 65]." Schaumburg, however, misreads *La Salle.*

In *La Salle,* a property owner challenged a zoning ordinance that restricted the use of certain property to single-family residences of less than 10,000 square feet. In upholding the ordinance, the supreme court considered six factors relevant in determining the validity of a particular type of zoning for a particular area. Those six factors include: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property.

In the present case, however, the original ordinance granting Amoco a special use permit is not the dispositive issue in the case. Even if it were, there is little doubt that Amoco's proposed use of the property satisfied the factors enumerated in *La Salle.*[8] For example, Allen Kracower, an urban planner and landscape architect, testified

---

[8]Since the board of trustees in granting the special use permit found Amoco satisfied all of the standards set forth in Schaumburg's zoning ordinance, and since there was no appeal of the special use prior to the repealer ordinance, we question whether a *de novo* trial requiring proof of

that Amoco's proposal was the highest and best use of the property and, further, that it did not detrimentally affect the public's health, safety and welfare. Thomas Koenig, Schaumburg's own director of planning, conceded that Amoco's intended use of the property constituted a significant improvement over the current use of the property.

In any event, unlike *La Salle*, the controlling issue in this case is not the impact of a particular type of zoning upon a particular piece of property. Rather, the issue here is whether a municipality may repeal a zoning ordinance solely on the grounds that the putative holder of a special use permit failed to comply with an unconstitutional exaction of property. We hold that it may not.

We are not unmindful, of course, that matters relating to zoning lie primarily within the discretion of the municipality, and it is not the province of the courts to interfere with that discretion unless the action of the municipality is shown to be unrelated to the public welfare. (*Treadway v. City of Rockford* (1962), 24 Ill. 2d 488, 493-94, 182 N.E.2d 219.) So, too, it is well established that a municipality may adopt or amend zoning ordinances "in order to promote and protect the public health, safety, morals, comfort and general welfare of the people." *St. Lucas Association v. City of Chicago* (1991), 212 Ill. App. 3d 817, 822, 571 N.E.2d 865.

Nevertheless, the circuit court in this case specifically found that "no public purpose was served *** by the repealer ordinance." This finding was predicated upon the fact that Schaumburg had previously approved Amoco's application for redevelopment, only to later rescind its approval, not because conditions relating to the property had changed, but because Amoco refused to comply with an unconstitutional taking of its property without receiving just compensation. Amoco's filing suit in Federal court only made matters worse. While on the stand, Thomas Koenig, Schaumburg's director of planning, was asked the following questions and gave the following answers:

> "Q. Does [the transcript of the hearing before the Zoning Board of Appeals] refresh your recollection as to whether you told the Zoning Board that the reason the amendment was being proposed was to, in the Village Attorney's opinion, help you get the case out of Federal Court?
> A. Yes.

---

the *La Salle* factors is even necessary. Our concern stems from the commonsense reason that, if the village board found that *all* of the standards justifying the issuance of the special use permit have been satisfied, except the conditional dedication, the board ought hardly to be able to require *de novo* proof of those factors again merely because of Amoco's refusal to comply with the conditional dedication that, under the law, is unconstitutional.

Q. And that, in fact, was the reason that you were proposing it, was it not?

\* \* \*

A. Yes."

Schaumburg eventually succeeded in passing the repealer ordinance and dismissing the case from Federal court. Of course, perhaps from a perverted point of view, obtaining dismissal of litigation by a legislative slight of hand serves to promote the public's interest, at least as far as Schaumburg is concerned. But we do not think the passage of the repealer ordinance under the circumstances of this case promotes and protects "the public health, safety, morals, comfort and general welfare of the people." *St. Lucas Association v. City of Chicago* (1991), 212 Ill. App. 3d 817, 822, 571 N.E.2d 865.

Accordingly, we affirm the circuit court's finding that Schaumburg's attempt to revoke the permit did not qualify as a reasonable exercise of Schaumburg's legislative authority, police powers notwithstanding.[9]

■ As a final matter, Schaumburg contends that the circuit court erred in admitting the record of the proceedings before the Zoning Board of Appeals. Although we agree with Schaumburg that the transcripts of such hearings are generally not admissible in a declaratory action (*Knor v. County of Madison* (1986), 151 Ill. App. 3d 767, 773, 502 N.E.2d 1063, *appeal denied* (1987), 114 Ill. 2d 547, 508 N.E.2d 729 (admission of such evidence would deprive a party of his or her right to have primary evidence or direct evidence presented for evaluation by the court); *Yusuf v. Village of Villa Park* (1983), 120 Ill. App. 3d 533, 543, 458 N.E.2d 575), the record here discloses that the circuit court refused to admit the transcripts as *substantive* evidence. In fact, not only did the court sustain an objection to Amoco's exhibit No. 12, the transcript of the proceedings before the Zoning Board of Appeals, but the court also sustained an objection to Amoco's exhibit No. 13, the zoning board minutes. What the court did was merely to admit party admissions showing that the dedication requirement was unrelated to the impact of the proposed development and that the subsequent repealer ordinance was enacted solely in response to Amoco's refusal to acquiesce in the unconstitutional expropriation of

---

[9]We note that, in conjunction with the repealer issue, the circuit court likewise found that no public policy was served by the original dedication requirement. Based upon our review of the record, we hold that the circuit court's finding was not against the manifest weight of the evidence, and we therefore also affirm that portion of the court's decision striking the dedication requirement.

its property. Such admissions accord with *Village of Skokie v. Gianoulis* (1994), 260 Ill. App. 3d 287, 299, 632 N.E.2d 106. Schaumburg's remaining contentions regarding the admission of certain other exhibits are unpersuasive and do not merit further discussion.

For the foregoing reasons, we affirm the circuit court in part, reverse in part, and remand the matter for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

COUSINS, P.J., and McNULTY, J., concur.